RIVER BEND ASSOCIATES, INC., ET AL. *v.* WATER POLLUTION CONTROL AUTHORITY OF THE TOWN OF SIMSBURY ET AL.
(SC 16760)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued September 12—officially released November 26, 2002

*Timothy S. Hollister*, with whom were *Michael A. Zizka* and, on the brief, *Amy E. Souchuns*, for the appellants (plaintiffs).

*Brian R. Smith*, with whom were *Karen A. L. Perry* and, on the brief, *Robert S. Melvin*, for the appellees (defendants).

*Opinion*

ZARELLA, J. The plaintiffs, River Bend Associates, Inc. (River Bend), and Griffin Land and Nurseries,

Inc. (Griffin),[1] appeal from the judgment of the trial court rendered in favor of the defendants, the water pollution control authority of the town of Simsbury (authority) and the town of Simsbury (Simsbury). The sole issue in this appeal is whether the trial court properly concluded that it lacked subject matter jurisdiction over the plaintiffs' action for a declaratory judgment and injunctive relief because the plaintiffs had failed to exhaust their administrative remedies pursuant to General Statutes §§ 22a-430 (f)[2] and 22a-436,[3] or General

---

[1] River Bend is a subsidiary of Griffin.

[2] General Statutes § 22a-430 (f) provides: "The commissioner may, by regulation, establish and define categories of discharges, including but not limited to, residential swimming pools, small community sewerage systems, household and small commercial disposal systems and clean water discharges, for which he may delegate authority to any other state agency, water pollution control authority, municipal building official or municipal or district director of health to issue permits or approvals in accordance with this section or to issue orders pursuant to sections 22a-428, 22a-431, 22a-432 and 22a-436. In establishing such categories the commissioner shall consider (1) whether each discharge in such category, because of size and character, is likely to cause significant pollution to the waters of the state; (2) whether knowledge and training concerning disposal systems for each discharge in such category is within the expertise of such agency, authority, official or director; (3) whether the source of each discharge in such category is likely to be within the jurisdiction of such agency, authority, official or director for other matters. The commissioner shall establish, by regulation, minimum requirements for disposal systems for discharges in such categories. Any permit denied or order issued by any such agency, authority, official or director shall be subject to hearing and appeal in the manner provided in sections 22a-436 and 22a-437. Any permit granted by any such agency, authority, official or director shall thereafter be deemed equivalent to a permit issued under subsection (b) of this section."

[3] General Statutes § 22a-436 provides: "Each order to abate pollution issued under section 22a-428 or 22a-431 or decision under subsection (b) or (c) of section 22a-430 shall be sent by certified mail, return receipt requested, to the subject of such order or decision and shall be deemed issued upon deposit in the mail. Any person who or municipality which is aggrieved by any such order or decision to deny an application or, in the case of a permit issued pursuant to the federal Water Pollution Control Act, any decision without prior hearing under subsection (b) or (c) of section 22a-430 may, within thirty days from the date such order or decision is sent, request a hearing before the commissioner. The commissioner shall not grant any request for a hearing at any time thereafter. After such hearing,

Statutes § 4-176 (a).[4] We conclude that the trial court properly determined that the plaintiffs had failed to exhaust their administrative remedies and that no exceptions to the exhaustion doctrine apply. Accordingly, we affirm the judgment of the trial court.

The following facts and procedural history are relevant to this appeal. River Bend owns a 363 acre parcel of land in Simsbury. In November, 1999, River Bend and Fairfield 2000 Homes, a nonprofit housing organization, applied to the Simsbury land use commissions for approval of a master plan to develop a 640 unit residential development to be called Meadowood. The portions of the November, 1999 application submitted to the Simsbury zoning commission and to the Simsbury planning commission were filed pursuant to the affordable housing statute, General Statutes § 8-30g, because the applicants had agreed to preserve at least 25 percent of the housing units for thirty years at prices within the economic reach of households having annual incomes of approximately $50,000 or less.

the commissioner shall consider the facts presented to him by the person or municipality, including, but not limited to, technological feasibility, shall consider the rebuttal or other evidence presented to or by him, and shall then revise and resubmit the order to the person or municipality, or inform the person or municipality that the previous order has been affirmed and remains in effect. The request for a hearing as provided for in this section or a decision under subsection (b) or (c) of section 22a-430 made after a public hearing shall be a condition precedent to the taking of an appeal by the person or municipality under the provisions of section 22a-437. The commissioner may, after the hearing provided for in this section, or at any time after the issuance of his order, modify such order by agreement or extend the time schedule therefor if he deems such modification or extension advisable or necessary, and any such modification or extension shall be deemed to be a revision of an existing order and shall not constitute a new order. There shall be no hearing subsequent to or any appeal from any such modification or extension."

[4] General Statutes § 4-176 (a) provides: "Any person may petition an agency, or an agency may on its own motion initiate a proceeding, for a declaratory ruling as to the validity of any regulation, or the applicability to specified circumstances of a provision of the general statutes, a regulation, or a final decision on a matter within the jurisdiction of the agency."

The authority is the agency established in Simsbury pursuant to General Statutes § 7-246 (a) and (b)[5] to exercise the powers granted by state law with respect to municipal sewerage systems. Pursuant to § 7-246 (b), the authority has adopted a plan that identifies areas in Simsbury where properties may be connected to Simsbury's sewer system. In order to regulate the amount of sewage discharged to the treatment plant

---

[5] General Statutes § 7-246 provides in relevant part: "(a) Any municipality may, by ordinance, designate its legislative body, except where the legislative body is the town meeting, or any existing board or commission, or create a new board or commission to be designated, as the water pollution control authority for such municipality. Any municipality located within the district of a regional water authority or regional sewer district established under an act of the General Assembly may designate such water authority or sewer district as the water pollution control authority for such municipality, with all of the powers set forth in this chapter for water pollution control authorities, provided such water authority or sewer district agrees to such designation. If a new board or commission is created, the municipality shall, by ordinance, determine the number of members thereof, their compensation, if any, whether such members shall be elected or appointed, the method of their appointment, if appointed, and removal and their terms of office, which shall be so arranged that not more than one-half of such terms shall expire within any one year. The water pollution control authority of the town within which there is a city or borough shall not exercise any power within such city or borough without the express consent of such city or borough, except that such consent shall not be required for any action taken to comply with a pollution abatement order issued by the Commissioner of Environmental Protection.

"(b) Each municipal water pollution control authority designated in accordance with this section may prepare and periodically update a water pollution control plan for the municipality. Such plan shall designate and delineate the boundary of: (1) Areas served by any municipal sewerage system; (2) areas where municipal sewerage facilities are planned and the schedule of design and construction anticipated or proposed; (3) areas where sewers are to be avoided; (4) areas served by any community sewerage system not owned by a municipality and (5) areas to be served by any proposed community sewerage system not owned by a municipality. Such plan shall also describe the means by which municipal programs are being carried out to avoid community pollution problems. The authority shall file a copy of the plan and any periodic updates of such plan with the Commissioner of Environmental Protection and shall manage or ensure the effective management of any community sewerage system not owned by a municipality. . . ."

and to the Farmington River, the authority allocates specific sewage disposal capacity to individual parcels within Simsbury's sewer district. Of the 363 acres of the Meadowood property, 267 are within Simsbury's sewer district. The authority has allocated a sewage disposal capacity of approximately 110,900 gallons per day to the 267 acres of Meadowood property within the sewer service area.

The November, 1999 Meadowood development plan proposed 640 residences, consisting of 595 homes within the sewer service district that would be served by sewers and 45 homes outside the sewer district that would be served by on-site septic systems. The residences to be located within the sewer district require 300,000 gallons per day of sewage disposal capacity. In order to provide sewage disposal capacity for the entire Meadowood plan within the sewer area, the plaintiffs applied to the authority for permission to transfer 190,000 gallons of sewage disposal capacity from a 122 acre parcel zoned as industrial, located one-half mile to the east of Meadowood, which the plaintiffs also own. The authority previously had allocated 382,000 gallons of disposal capacity to the industrial parcel. In March, 2000, the authority denied the plaintiffs' transfer request, stating that the transfer would leave the industrial parcel without adequate capacity for future industrial development.

In response to the authority's March, 2000 denial, the plaintiffs reduced the Meadowood development plan to a total of 371 homes. The plaintiffs' revised plan proposed 324 homes to be located within Simsbury's sewer service area and 47 homes to be located outside the sewer service area. The revised plan proposed that 269 of the 324 homes within the sewer service area be connected to the public sewer, utilizing the entire 110,900 gallons of disposal capacity, and that the remaining 55 homes be served by individual, on-site

septic systems. The remaining 47 homes located outside the sewer service area also were to be served by individual, on-site septic systems.

The plaintiffs applied to the Farmington Valley health district (health district) in May, 2000, for approval of the 102 homes to be served by septic systems. The state department of health services (department of health) has authority pursuant to General Statutes § 22a-430 (g) to regulate and issue permits for on-site subsurface sewage disposal systems for single-family homes or to delegate that authority to other agencies.[6] The health district is the agency designated by the department of

[6] General Statutes § 22a-430 (g) provides: "The commissioner shall, by regulation adopted prior to October 1, 1977, establish and define categories of discharges which constitute household and small commercial subsurface disposal systems for which he shall delegate to the Commissioner of Public Health the authority to issue permits or approvals and to hold public hearings in accordance with this section, on and after said date. The Commissioner of Public Health shall, pursuant to section 19a-36, establish minimum requirements for household and small commercial subsurface disposal systems and procedures for the issuance of such permits or approvals by the local director of health or a sanitarian registered pursuant to chapter 395. As used in this subsection, small commercial disposal systems shall include those subsurface disposal systems with a capacity of five thousand gallons per day or less. Any permit denied by the Commissioner of Public Health, or a director of health or registered sanitarian shall be subject to hearing and appeal in the manner provided in section 19a-229. Any permit granted by said Commissioner of Public Health, or a director of health or registered sanitarian on or after October 1, 1977, shall be deemed equivalent to a permit issued under subsection (b) of this section."

The mandatory delegation to the commissioner of public health required by § 22a-430 (g) is given effect by § 22a-430-1 (b) (1) (A) of the Regulations of Connecticut State Agencies, which provides: "The Commissioner may by agreement delegate authority to issue permits, approvals or orders or to hold public hearings in accordance with Section 22a-430 (f) and Section 22a-2 (b) (2) of the Connecticut General Statutes, as amended, for various categories of discharge to any agent as defined in subsection (a) of this section; and the Commissioner hereby delegates authority to the Commissioner of Health Services in accordance with Section 22a-430 (g) of the Connecticut General Statutes to issue permits, approvals, and to hold public hearings for Categories I and II. Categories I and II are hereby exempted from the requirements for public notice contained in Section 22a-430 (b) of the Connecticut General Statutes."

health to process applications in Simsbury and to issue permits for on-site household septic systems with capacities of less than 5000 gallons per day. On June 13, 2000, after required soil testing was completed, the health district issued a letter to Simsbury approving the soils on all but two of the 102 proposed lots "as being capable of supporting on-site septic systems consistent with public health standards."

On May 23, 2000, the plaintiffs submitted their revised development plan to the authority, seeking approval of the proposed connection of 269 homes to Simsbury's sewer system. At a June 28, 2000 meeting, the authority voted to deny the plaintiffs' revised application for the Meadowood project, giving a variety of reasons,[7] includ-

---

[7] The minutes from the June 28, 2000 meeting reflected the following regarding the actual vote on the application:

"Chairman [Richard S.] Lange proposed the following for action by the Authority:

"Moved, that the Authority deny the revised application of Riverbend Associates, Inc. and Griffin Land & Nurseries, Inc. for the Meadowood Project for the following non-exhaustive list of reasons:

"The [authority] feels that the revised Meadowood plan to put 55 units that are within the Sewer Service Area (SSA) on septic is an effort to bypass the [authority's] long standing sewer allocation plan and the practice of the [authority] and the State Building Code requiring new construction units to be connected to available sewers. The only exceptions are isolated instances where topographical or environmental considerations make septic a more logical choice for a small number of units.

"Although there have been numerous discussions concerning the durability of present day septic systems, the fact remains that the State of Connecticut is adamant, as indicated by the Public Health Regulations, [t]hat a secondary reserve septic field be provided before any subsurface system is approved. This clearly indicates that the State feels that primary systems can fail and cannot be reconstructed in place. The obvious solutions for units within the SSA, barring revoking the Certificate of Occupancy, is to then connect the failed septic system to the sewer, which is what we are trying to avoid in the first place.

"Based on comments from the Town Staff, it is clear that the Farmington Valley Health District is in favor of any new construction units within the SSA being connected to the Sewer System.

"The 110,000 gallon allocation is, and will remain, available and the [authority] is inclined to approve any application that utilizes up to this allocation.

ing the authority's belief that the revised Meadowood plan to put fifty-five units, which were to be *within* the sewer service area, on septic systems was an effort to bypass the authority's sewer allocation plan. Additionally, the authority indicated that septic systems are unreliable, and that if a septic system within the sewer service area failed, the solution, outside of revoking the certificate of occupancy, would be to connect the failed septic system to the sewer, which was exactly what the authority had been trying to avoid. The authority indicated that the 110,000 gallon allocation was, and would remain, available and that the authority was inclined to approve any application that utilized up to that allocation. Pursuant to the June 28, 2000 vote, the authority issued a letter, dated June 29, 2000, denying the plaintiffs' application to connect the 269 homes to Simsbury's sewer system.

Thereafter, the plaintiffs commenced the action underlying this appeal in the Superior Court, seeking declaratory and injunctive relief in connection with the authority's denial of their application. The plaintiffs' complaint alleged, inter alia, that the authority's assertion of jurisdiction over, and its prohibition of, the construction of on-site septic systems within the sewer service district was ultra vires because neither state statutes, regulations nor local ordinances authorize water pollution control authorities to prohibit septic systems within sewer service areas. The plaintiffs also alleged that the authority's action regarding the on-site septic systems was preempted by state statutes and

"Mr. [Warren B.] Coe: Moved, that the Authority approve the motion as proposed for the Meadowood Project.

"Mr. [Joshua] Storm: Seconded.

"So Voted."

Although the authority originally had allocated a sewage disposal capacity of 110,900 gallons per day to the 267 acres within the sewer service area, the minutes from the June 28 meeting included a reference to an allocation of 110,000 gallons a day.

regulations, which delegate authority to regulate household septic systems to the department of health and its designees, which in fact, had approved all but two of the proposed septic systems. The plaintiffs further alleged that the authority was not authorized to enforce the state building code and, alternatively, that the authority's action violated the building code because the code permits septic systems. Finally, the plaintiffs alleged that the defendants violated General Statutes § 8-2,[8] which, the plaintiffs contended, requires municipalities to encourage housing development consistent with existing soil types.

In response to the plaintiffs' complaint for declaratory and injunctive relief, the defendants filed a motion to dismiss asserting that the trial court lacked subject matter jurisdiction because the plaintiffs had failed to exhaust their administrative remedies. In its memorandum of decision on the defendants' motion to dismiss, the trial court concluded that it lacked subject matter jurisdiction because the plaintiffs had failed to exhaust available administrative remedies pursuant to §§ 22a-430 (f) and 22a-436, or § 4-176,[9] and that no exceptions to the exhaustion doctrine were applicable. The trial court, therefore, granted the defendants' motion to dismiss and rendered judgment accordingly, from which the plaintiffs appealed to the Appellate Court. We transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

The plaintiffs claim that the trial court improperly determined that it lacked subject matter jurisdiction

---

[8] General Statutes § 8-2 (a) provides in relevant part: "Such regulations shall also encourage the development of housing opportunities, including opportunities for multifamily dwellings, consistent with soil types, terrain and infrastructure capacity, for all residents of the municipality and the planning region in which the municipality is located, as designated by the Secretary of the Office of Policy and Management under section 16a-4a. . . ."

[9] See footnotes 2 through 4 of this opinion.

over their action for declaratory and injunctive relief. In support of their claim, the plaintiffs first contend that the trial court improperly determined that §§ 22a-430 (f) and 22a-436, or § 4-176 (a) provide the plaintiffs with an adequate administrative remedy that the plaintiffs failed to exhaust. We affirm the judgment of the trial court.

We have long held that "because [a] determination regarding a trial court's subject matter jurisdiction is a question of law, our review is plenary." (Internal quotation marks omitted.) *Lawrence Brunoli, Inc.* v. *Branford*, 247 Conn. 407, 410, 722 A.2d 271 (1999); see *Rich-Taubman Associates* v. *Commissioner of Revenue Services*, 236 Conn. 613, 618, 674 A.2d 805 (1996).

In order to analyze properly whether an adequate administrative remedy exists, we must first properly characterize the actions taken by the authority regarding the plaintiffs' application. In May, 2000, the plaintiffs submitted their revised development plan to the authority, seeking approval of an application to connect 269 homes to the Simsbury sewer system. In June, 2000, the authority voted and issued a letter denying the plaintiffs' application. The plaintiffs characterize the authority's denial as a prohibition against the installation of septic systems within the sewer service area.[10]

The plaintiffs, however, confuse the authority's decision to deny the application for a permit to connect to

[10] The plaintiffs, in their request for declaratory and injunctive relief, claim that the "assertion of jurisdiction over, and prohibition, within its sewer service district, of the construction of on-site septic systems that conform to the [department of health] regulations is (a) ultra vires because state statutes and regulations do not authorize water pollution control authorities to prohibit septic systems within sewer service areas; (b) ultra vires because local ordinances do not authorize the [authority] to prohibit septic systems within the sewer service area; and (c) preempted by state statutes and regulations, which delegate authority to regulate household septic systems to the Department of Health Services and its designees."

the sewer system with the rationale behind the decision. The plaintiffs acknowledge that they applied to the authority only for approval to connect 269 homes to the Simsbury sewer system. The authority denied that application. While some of the reasons given by the authority for the denial of the application involved the plaintiffs' plans to construct fifty-five homes with septic systems within the sewer service area, nevertheless, the actual application that was denied was to connect 269 homes to the sewer system.

The plaintiffs' claim that no administrative agency had the authority to provide an adequate administrative remedy is based on two assertions, both of which are premised on the plaintiffs' faulty characterization of the authority's actions. First, the plaintiffs claim that the authority derives its powers from § 7-246,[11] which outlines the powers of municipal water pollution control authorities but does not provide recourse for violations. The plaintiffs further claim that applications made pursuant to § 7-246 do not fall within the purview of the department of environmental protection (department) under § 22a-430 (f). In other words, the plaintiffs claim that the authority's power is established by § 7-246 (b), and that § 22a-430 (f) is not controlling.

The plaintiffs' contention that § 7-246 establishes water pollution control authorities as creatures of the municipality is not in dispute. It is evident from a reading of the statute that the legislature empowered municipalities to establish water pollution control authorities. Section 7-246 (a) provides in relevant part: "Any municipality may, by ordinance, designate its legislative body, except where the legislative body is the town meeting, or any existing board or commission, or create a new board or commission to be designated, as the water pollution control authority for such municipality. Any

[11] See footnote 5 of this opinion.

municipality located within the district of a regional water authority or regional sewer district established under an act of the General Assembly may designate such water authority or sewer district as the water pollution control authority for such municipality, with all of the powers set forth in this chapter for water pollution control authorities, provided such water authority or sewer district agrees to such designation. . . . The water pollution control authority of the town within which there is a city or borough shall not exercise any power within such city or borough without the express consent of such city or borough, except that such consent shall not be required for any action taken to comply with a pollution abatement order issued by the Commissioner of Environmental Protection."[12] Therefore, it reasonably cannot be disputed that the authority is an entity created by Simsbury under express legislative authorization.

Certain powers vested in the water pollution control authority are set forth in § 7-246 (b). "Each municipal water pollution control authority designated in accordance with this section may prepare and periodically update a water pollution control plan for the municipality. Such plan shall designate and delineate the boundary of: (1) Areas served by any municipal sewerage system; (2) areas where municipal sewerage facilities are planned and the schedule of design and construction anticipated or proposed; (3) areas where sewers are to be avoided; (4) areas served by any community sewerage system not owned by a municipality and (5) areas to be served by any proposed community sewerage system not owned by a municipality. Such plan shall also describe the means by which municipal programs are being carried out to avoid community pollution problems. The authority shall file a copy of the plan and any periodic updates of such plan with the Commis-

---

[12] See footnote 5 of this opinion.

sioner of Environmental Protection and shall manage or ensure the effective management of any community sewerage system not owned by a municipality." General Statutes § 7-246 (b).[13]

The plaintiffs contend, however, that § 7-246 does not contain any language regarding approval processes or the authority to issue permits and, therefore, that the department has no administrative authority to review the legality of authority actions. This contention, however, is faulty because it disregards the distinct grant of authority from the department to water pollution control authorities contained in § 22a-430 (f). Further, the plaintiffs' contention is premised on their mischaracterization of the authority's decision as a denial of septic system installation, rather than as a denial of a sewer connection application.

Section 22a-430 (f) provides in relevant part that "[t]he commissioner may, by regulation, establish and define categories of discharges, *including but not limited to*, residential swimming pools, small community sewerage systems, household and small commercial disposal systems . . . for which he may delegate authority to any other state agency [or] water pollution control authority . . . to issue permits or approvals . . . ."[14] (Emphasis added.) The broad "including but not limited to" language of § 22a-430 (f) establishes that the department may delegate authority to water pollution control authorities to issue permits for all types of discharges that involve sewer connections.

As it applies to discharge permits other than septic systems,[15] including sewer connection permits, § 22a-

---

[13] See footnote 5 of this opinion.

[14] See footnote 2 of this opinion.

[15] Permits for septic systems are specifically controlled by § 22a-240 (g) and, pursuant to that section, authority for issuing permits for septic systems has been delegated to the department of health.

430 (f) requires that the commissioner of the department (commissioner) act by way of regulation to effect the permissive delegation of authority. The commissioner has promulgated § 22a-430-1 (b) (1) (A) of the Regulations of Connecticut State Agencies, which provides for the delegation of permitting authority to water pollution control authorities. Specifically, § 22a-430-1 (b) (1) (A)[16] authorizes the commissioner, by agreement, to delegate to any agent as defined in § 22a-430-1 (a) the authority to issue permits or approvals for the various categories of discharges.[17] Section 22a-430-1 (a) defines agent as "any state agency other than the Department of Environmental Protection, any *municipal water pollution control authority,* any municipal building official or municipal or district director of health." (Emphasis added.) In addition, § 22a-430-1 (a) includes a category of discharge entitled

[16] Section 22a-430-1 (b) (1) (A) of the Regulations of Connecticut State Agencies provides: "The Commissioner may by agreement delegate authority to issue permits, approvals or orders or to hold public hearings in accordance with Section 22a-430 (f) and Section 22a-2 (b) (2) of the Connecticut General Statutes, as amended, for various categories of discharge to any agent as defined in subsection (a) of this section; and the Commissioner hereby delegates authority to the Commissioner of Health Services in accordance with Section 22a-430 (g) of the Connecticut General Statutes to issue permits, approvals, and to hold public hearings for Categories I and II. Categories I and II are hereby exempted from the requirements for public notice contained in Section 22a-430 (b) of the Connecticut General Statutes."

[17] The record does not reflect, and the parties do not indicate, whether an actual agreement regarding the delegation of sewer connection approval authority exists between the department and the authority. Notwithstanding the fact that neither party has challenged the existence of such a delegation agreement, if a challenge were to be made, § 4-176 provides the appropriate procedure to determine whether the department has, in fact, entered into an agreement with the authority. Section 4-176 (a) provides in relevant part that "[a]ny person may petition an agency . . . for a declaratory ruling as to the validity of any regulation, or the applicability to specified circumstances of a provision of the general statutes . . . ." Thus, it is within the purview of the department to rule on whether or not such an agreement exists.

"[d]omestic sewage."[18] Thus, § 22a-430 (f) of the General Statutes and § 22a-430-1 of the Regulations of Connecticut State Agencies set forth the power of the authority and department to approve or deny sewer connection applications.

The plaintiffs' second claim is that, although § 22a-430 (f) gives the department broad delegation authority over sewer systems, § 22a-430 (g) directs the commissioner to delegate the authority to issue permits and approvals for septic systems to the department of health/health district. Thus, the plaintiffs contend that because the authority to issue approvals for septic systems has been divested from the department, an appropriate administrative remedy with the department does not exist. This conclusion, as previously noted, is premised upon the plaintiffs' faulty characterization of the authority's actions.

Section 22a-430 (g) provides in relevant part that "[t]he commissioner shall, by regulation . . . establish and define categories of discharges which constitute household and small commercial subsurface disposal systems for which he shall delegate to the Commissioner of Public Health the authority to issue permits or approvals . . . ." Thus, § 22a-430 (g) mandates that the commissioner, by regulation, delegate permitting and approval authority over septic systems to the department of health. The commissioner has effected this delegation through § 22a-430-1 (b) (1) (A), which provides in relevant part that "the Commissioner hereby

[18] Section 22a-430-1 (a) of the Regulations of Connecticut State Agencies provides: " 'Domestic sewage' means sewage that consists of water and human excretions or other waterborne wastes incidental to the occupancy of a residential building or a non-residential building but not including manufacturing process water, cooling water, wastewater from water softening equipment, commercial laundry wastewater, blowdown from heating or cooling equipment, water from cellar or floor drains or surface water from roofs, paved surfaces or yard drains."

delegates authority to the Commissioner of Health Services in accordance with Section 22a-430 (g) of the Connecticut General Statutes to issue permits [and] approvals . . . ." Thus, § 22a-430 (g) applies only to septic system permits, not sewer connection permits. As previously discussed, while some of the reasons given for denying the plaintiffs' application involved the plaintiffs' plan to construct fifty-five homes with septic systems within the sewer service area, the application that was denied was to connect 269 homes to the sewer system. Consequently, the plaintiffs confuse what was denied with the rationale behind the denial. The mandatory delegation of authority over septic systems found in § 22a-430 (g) is, therefore, irrelevant to the question of jurisdiction over the authority's action.

We have determined that the department has jurisdiction over the authority's denial of the plaintiffs' sewer connection application. We must now determine whether an adequate administrative remedy is available to the plaintiffs that will resolve the issues raised in their request for declaratory and injunctive relief.

"The doctrine of exhaustion of administrative remedies is well established in the jurisprudence of administrative law. . . . The doctrine provides that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted. . . . Where a statutory requirement of exhaustion is not explicit, courts are guided by [legislative] intent in determining whether application of the doctrine would be consistent with the statutory scheme. . . . Consequently, [t]he requirement of exhaustion may arise from explicit statutory language or from an administrative scheme providing for agency relief. . . ." (Citations omitted; internal quotation marks omitted.) *Waterbury* v. *Washington*, 260 Conn. 506, 529–30, 800 A.2d 1102 (2002).

"If the available administrative procedure . . . provide[s] the plaintiffs with a mechanism for attaining the remedy that they seek . . . they must exhaust that remedy." (Citation omitted; internal quotation marks omitted.) *Cannata* v. *Dept. of Environmental Protection*, 215 Conn. 616, 629–30 n.9, 577 A.2d 1017 (1990). "The plaintiff's preference for a particular remedy does not determine the adequacy of that remedy. [A]n administrative remedy, in order to be adequate, need not comport with the [plaintiffs'] opinion of what a perfect remedy would be." (Internal quotation marks omitted.) *Kish* v. *Cohn*, 59 Conn. App. 236, 240, 756 A.2d 313 (2000).

Section 22a-430 (f) provides that any permit denied or order issued pursuant to that section shall be subject to a hearing and appeal as provided in § 22a-436 and General Statutes § 22a-437.[19] Section 22a-436 provides that any person aggrieved by an order or decision to deny an application may request a hearing before the commissioner. Section 22a-437 provides that any person aggrieved by a decision by the commissioner may appeal from a final determination of the commissioner to the Superior Court.

We do not reach the merits of whether the authority properly denied the plaintiffs' application solely because the Meadowood plan included fifty-five homes within the sewer service area that would be served by individual septic systems. We do, however, conclude that available administrative remedies pursuant to

[19] General Statutes § 22a-437 (a) provides: "Any person who or municipality which is aggrieved by a decision under subsection (b) or (c) of section 22a-430 or by any order of the commissioner other than an order under section 22a-6b, to abate pollution may, after a hearing by the commissioner as provided for in section 22a-436 or subsection (b) or (c) of section 22a-430, appeal from the final determination of the commissioner based on such hearing to the Superior Court as provided in chapter 54. Such appeal shall have precedence in the order of trial as provided in section 52-192."

§§ 22a-430 (f), 22a-436 and 22a-437 exist. When an appeal is taken as authorized under § 22a-430 (f), the commissioner has full authority under § 22a-436 to consider facts and evidence and to revise the authority's action on the application as appropriate. If the plaintiffs are aggrieved by the commissioner's decision, then they can pursue an appeal to the Superior Court pursuant to § 22a-437.

We conclude, therefore, that the authority had jurisdiction to entertain the plaintiffs' application to connect 269 homes to the Simsbury sewer system and that the department was the appropriate agency to which the plaintiffs could have appealed the denial of the application. Thus, the plaintiffs had an adequate administrative remedy that they failed to exhaust.

Finally, the plaintiffs argue that declaratory relief is authorized by Practice Book § 17-55 (3) despite the availability of other remedies.[20] We disagree.

The plaintiffs claim that Practice Book § 17-55 (3) vests the trial court with the discretion to allow a declaratory action to proceed despite the existence of alternative procedures. This conclusion, however, if allowed to stand in cases where an adequate administrative remedy exists, would contravene our well established precedent regarding the exhaustion doctrine and subject matter jurisdiction. "The doctrine of exhaustion is

---

[20] Practice Book § 17-55 provides: "A declaratory judgment action may be maintained if all of the following conditions have been met:

"(1) The party seeking the declaratory judgment has an interest, legal or equitable, by reason of danger of loss or of uncertainty as to the party's rights or other jural relations;

"(2) There is an actual bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations which requires settlement between the parties; and

"(3) In the event that there is another form of proceeding that can provide the party seeking the declaratory judgment immediate redress, the court is of the opinion that such party should be allowed to proceed with the claim for declaratory judgment despite the existence of such alternate procedure."

grounded in a policy of fostering an orderly process of administrative adjudication and judicial review in which a reviewing court will have the benefit of the agency's findings and conclusions. . . . The doctrine . . . furthers the salutary goals of relieving the courts of the burden of deciding questions entrusted to an agency . . . in advance of possible judicial review. . . . Most important, a favorable outcome will render review by the court unnecessary [because] as the United States Supreme Court has noted: A complaining party may be successful in vindicating his rights in the administrative process. If he is required to pursue his administrative remedies, the courts may never have to intervene." (Internal quotation marks omitted.) *Johnson* v. *Statewide Grievance Committee*, 248 Conn. 87, 95, 726 A.2d 1154 (1999).

"It is a settled principle of administrative law that, if an adequate administrative remedy exists, it must be exhausted before the Superior Court will obtain jurisdiction to act in the matter. . . . Exhaustion is required even in cases where the agency's jurisdiction over the proposed activity has been challenged. . . . This requirement reflects the legislative intent that such issues be handled in the first instance by local administrative officials in order to provide aggrieved persons with full and adequate administrative relief, and to give the reviewing court the benefit of the local board's judgment. . . .

"We have recognized, however, certain limited exceptions to the exhaustion requirement. Such exceptions include where the available relief is inadequate or futile . . . or where local procedures cannot effectively, conveniently or directly determine whether the plaintiff is entitled to the relief claimed." (Citations omitted; internal quotation marks omitted.) *O & G Industries, Inc.* v. *Planning & Zoning Commission*, 232 Conn. 419, 425–26, 655 A.2d 1121 (1995).

Practice Book § 17-55 (3) is not a viable exception to the exhaustion doctrine. Practice Book § 17-55 provides that "[a] declaratory judgment action may be maintained if all of the following conditions have been met: (1) The party seeking the declaratory judgment has an interest, legal or equitable, by reason of danger of loss or of uncertainty as to the party's rights or other jural relations; (2) There is an actual bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations which requires settlement between the parties; and (3) In the event that there is another form of proceeding that can provide the party seeking the declaratory judgment immediate redress, the court is of the opinion that such party should be allowed to proceed with the claim for declaratory judgment despite the existence of such alternate procedure." General Statutes § 51-14 (a), however, provides in relevant part that the rules of practice "shall not abridge, enlarge or modify any substantive right nor the jurisdiction of any of the courts. . . ." Consistent with § 51-14 (a), we have stated that "[t]he subject matter jurisdiction of this court is defined by statute." *Simms* v. *Warden*, 229 Conn. 178, 181, 640 A.2d 601 (1994). "Provisions of the Practice Book cannot confer jurisdiction on this court." Id., 184. Thus, Practice Book § 17-55 (3) does not confer subject matter jurisdiction on the court. We agree with the defendants' characterization of Practice Book § 17-55 (3) as a rule that merely establishes a test to determine the availability of declaratory relief.

We have acknowledged, however, that certain statutes give the Superior Court subject matter jurisdiction to render declaratory judgments. For example, General Statutes § 52-29 (a)[21] provides in relevant part that "[t]he

[21] General Statutes § 52-29 (a) provides in relevant part: "The Superior Court in any action or proceeding may declare rights and other legal relations on request for such a declaration, whether or not further relief is or could be claimed. . . ."

Superior Court in any action or proceeding may declare rights and other legal relations on request for such a declaration, whether or not further relief is or could be claimed. . . ." Nevertheless, "§ 52-29, granting declaratory judgment jurisdiction to the Superior Court, does not qualify as the type of separate statutory authorization"; (internal quotation marks omitted) *Connecticut Life & Health Ins. Guaranty Assn.* v. *Jackson*, 173 Conn. 352, 358, 377 A.2d 1099 (1977); that allows for a "complete bypassing of an administrative agency with undeniable jurisdiction over the subject matter . . . ." Id.

"The doctrine of exhaustion is grounded in a policy of fostering an orderly process of administrative adjudication and judicial review in which a reviewing court will have the benefit of the agency's findings and conclusions. To allow a party seeking a declaratory judgment to bypass the entire process under certain circumstances would be to interject an unnecessary and potentially confusing element into an otherwise well-defined area of the law." Id., 358–59.

Finally, we have acknowledged that certain statutory schemes do not embody the exhaustion doctrine because the statutes clearly express the legislative intent to bypass exhaustion requirements. For example, in *Waterbury* v. *Washington*, supra, 260 Conn. 530, we stated that "the exhaustion doctrine is based on a judicial determination of a legislative intent that in certain cases the courts do not have initial subject matter jurisdiction because the legislature has committed the initial resolution of the matters in question to an administrative agency. Therefore, this doctrine does not apply when the legislature determines, by appropriate legislation, that a court may exercise subject matter jurisdiction despite the fact that there also may be administrative procedures available that would, absent

such legislation, normally deprive the court of jurisdiction."

The facts in *Waterbury* are sharply distinguishable from the facts in the case at hand. In *Waterbury*, we determined that exhaustion was not required because a very specific provision of the Connecticut Environmental Protection Act; General Statutes § 22a-14 et seq.; could not be reconciled with the exhaustion doctrine, and the provision clearly expressed the legislative intent to bypass exhaustion requirements. *Waterbury* v. *Washington*, supra, 260 Conn. 531–46.

Thus, our case law makes clear that court rules, such as Practice Book § 17-55 (3), and broad statutory grants of jurisdiction, such as § 52-29, are not intended to circumvent the well established principles of exhaustion. To bypass the requirement of exhaustion and confer upon the courts subject matter jurisdiction where there otherwise would be no jurisdiction, a statute must exist that expresses the legislature's intent to bypass exhaustion requirements. In the case at hand, the plaintiffs have not set forth such a statute.

We conclude that the plaintiffs have adequate administrative remedies available to them. Furthermore, we conclude that the plaintiffs have not presented any viable exceptions to the exhaustion doctrine. Consequently, the plaintiffs are required to exhaust their administrative remedies before the trial court has subject matter jurisdiction over their declaratory and injunctive relief actions.

The judgment is affirmed.

In this opinion the other justices concurred.