AVALONBAY COMMUNITIES, INC., ET AL. *v.*
SEWER COMMISSION OF THE CITY
OF MILFORD ET AL.
(SC 17131)

Borden, Norcott, Palmer, Vertefeuille and Zarella, Js.

---

Argued April 21—officially released July 27, 2004

*Joseph P. Williams*, with whom were *Timothy S. Hollister, Beth B. Critton, Brian Lema* and, on the brief, *Stephen W. Studer*, for the appellants (plaintiffs).

*Michael J. Dorney*, with whom were *Matthew A. Sokol, Marilyn J. Lipton*, city attorney, and, on the brief, *Charles R. Andres*, for the appellees (defendants).

*Opinion*

NORCOTT, J. This appeal arises out of an action brought by the named plaintiff, AvalonBay Communities, Inc. (AvalonBay),[1] against the defendants, the sewer commission of the city of Milford and its chairman, Peter Vita (collectively, the commission), and the city of Milford (city), seeking a writ of mandamus ordering the commission to approve its application to connect a proposed housing development to the city's sanitary sewer system. After a bench trial, the trial court denied the writ requested. AvalonBay appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

On appeal, AvalonBay claims that the trial court improperly denied its request for a writ of mandamus because: (1) its application complied with all of the applicable regulations of the commission, and, therefore, it had a legal right to performance; (2) the commission had no discretion to depart from the ministerial task of approving the application; and (3) it had no adequate remedy at law. Additionally, AvalonBay claims that the trial court's factual findings were clearly erroneous, and that the judgment of the trial court thwarts this state's public policy in favor of the development of affordable housing. In response, the commission claims

---

[1] The other plaintiff involved in this appeal is Terence McGannon, the administrator of the estate of Patricia McGannon. Because the plaintiffs have referred to themselves collectively as AvalonBay throughout their brief, we will do similarly throughout this opinion.

that: (1) the trial court properly found that the commission had discretion to deny AvalonBay's application; (2) the trial court properly exercised its discretion in denying the relief requested; and (3) the trial court's evidentiary findings were not clearly erroneous. We agree with the commission. Accordingly, we affirm the judgment of the trial court.

The following facts, as set forth by the trial court in its memorandum of decision, are relevant to this appeal. "The property, which is subject of the mandamus, is owned by the [e]state of Patricia McGannon and is presently under contract of sale to AvalonBay . . . the proposed developer of the property. . . . The property consists of some forty-two acres . . . and is located in the northwestern section of the city . . . in the immediate vicinity of and south of the Wilbur Cross Parkway. More specifically, the property is located southwest of the intersection of Wheeler's Farm Road and Wolf Harbor Road. The property is presently unimproved. AvalonBay proposes to erect thereon [a development containing] some 284 units of luxury housing,"[2] a percentage of which would be set aside as "moderate income housing" under General Statutes § 8-30g (3).

The commission "was created by [29 Spec. Acts 142, No. 139 (1959)] of the 1959 General Assembly . . . . In its present form, the provisions establishing and maintaining the commission may be found in article IV, [§§ 2 and 9] of the Milford charter. As the water pollution control authority, the commission holds the powers vested in such an authority by way of chapter 103 of the . . . General Statutes.[3]

"Pursuant to the authority contained therein, a facility plan and environmental assessment dated January,

---

[2] AvalonBay's original proposal called for 379 units, but this number subsequently was reduced to 284 units.

[3] Chapter 103 of the General Statutes, which contains General Statutes §§ 7-245 through 7-273a, addresses municipal sewerage systems.

1981, [was] filed with the state of Connecticut. Included with the plan was a 1979 map of the proposed sewer system and extensions . . . [which demonstrated] that the city and [the] commission contemplated the eventual expansion of the sanitary sewer system so as to encompass the entire city. Since that time, the area of coverage has been steadily extended by a series of contracts designated by year and number. . . .

"Contract No. 1998-1 called for the extension of the sewer system to serve an area south of the Wilbur Cross Parkway, including Wolf Harbor Road and several other streets in the area. . . . [Specifically] contract No. 1998-1 was designed as an extension of the [city] sanitary sewer system to run from West River Street westerly along Wolf Harbor Road to a point approximately 200 feet easterly of [AvalonBay's] property."[4]

"On February 26, 2000, a contract was let to perform the work specified in [contract No.] 1998-1. During the course of that work, serious difficulties were encountered. Located in Wolf Harbor Road [were] a natural gas main and a sixteen inch water main. As the construction proceeded, the contractor encountered bedrock. . . . Attempts to remove the bedrock by blasting caused several breaks [in the water main], disrupting the water flow in the area. On May 4, 2000, the blasting disrupted the water main for the third time, causing the regional water authority to demand a halt to the project. The commission ordered a halt to the project, although it allowed an extension of the sewer main to station 12-40 . . . . The bedrock was removed by mechanical means [in that limited area]. The contractor offered to continue the project removing the bedrock by mechanical means. This would . . . [have] entail[ed] an addi-

---

[4] Although very close to Wolf Harbor Road, AvalonBay's property does not actually border that road. Moreover, because the property was vacant at the time, the sewer system proposed for Wolf Harbor Road under contract No. 1998-1 was not intended specifically to serve the proposed development.

tional cost for which funds would have to be appropriated. . . .[5]

"In an effort to find a solution to the problem, the commission, on July 6, 2000, voted to halt the construction in Wolf Harbor Road under contract No. 1998-1 and to include that section of Wolf Harbor [Road] under the design contract No. 2000-1 . . . [which the commission] had entered into . . . with its consultants for the design and extension of the sanitary sewer system covering an area north of Wilbur Cross Parkway . . . . The area covered by [contract No.] 2000-1 is to be connected to the area covered by [contract No.] 1998-1. . . . An amendment to contract [No.] 2000-1 was entered into to consider the Boy's Village tie-in and the redesign of the sewers in Wolf Harbor Road west of station 12-40, the termination point for contract [No.] 1998-1."

During 2000, AvalonBay had "applied to various land use boards in the city . . . seeking various approvals for its proposed development of a luxury apartment community with an affordable housing component, pursuant to . . . § 8-30g." More specifically, in "July, 2000, AvalonBay [had] filed an application for sewer approval. The commission, in August, 2000, denied the application without prejudice, giving as its reason that no sewer line was then available. The following November, [AvalonBay] filed a second application asking for permission to connect their development to the sewerage system. The commission, on December 17, 2000, denied the application without prejudice, giving as [its] reason for [denial] that a design study was under way

---

[5] AvalonBay and the commission dispute whether the work under contract No. 1998-1 was halted specifically for reasons of health and safety, namely, the threat of additional damage to the water and gas lines, or for the lack of appropriated funds to cover the additional expenses arising from the need to perform mechanical removal of the bedrock.

for the Wheeler's Farm Road and Wolf Harbor Road area, and the study was then only 10 percent complete."

"A mandamus action was brought by . . . AvalonBay on April 27, 2001, seeking an order directing the [commission] to permit the connection of [its proposed] development to the city . . . sewer system.[6] [Subsequently, a] third application was filed with the [commission] on July 19, 2001. The matter was tabled awaiting finalized plans for the preliminary design [under contract No. 2000-1] of that segment of the [sewer system] that would service the area, including [AvalonBay's] property."[7] AvalonBay's third application is still pending before the commission. Consequently, because work under contract No. 1998-1 was halted, and the plans being developed under contract No. 2000-1 were still in the preliminary stages of design, there was no sewer system in the road closest to AvalonBay's property, namely, Wolf Harbor Road, at the time of trial. In a written memorandum of decision, the trial court denied AvalonBay's request for a writ of mandamus. This appeal followed.

The requirements for the issuance of a writ of mandamus are well settled. "Mandamus is an extraordinary remedy, available in limited circumstances for limited

---

[6] Specifically, AvalonBay had requested "[a] writ of mandamus ordering the [city and the commission] to act on and approve AvalonBay's July, 2001 [a]pplication for conceptual approval to connect the proposed Avalon at Milford development to the [city] sanitary sewer system either at Wheeler's Farm Road or at Wolf Harbor Road . . . ."

[7] In its memorandum of decision, the trial court noted: "The review of the plan by the inland wetlands commission [wetlands commission] and the city engineer had not been received at the time of the hearing [on AvalonBay's third application]. . . . The plan was . . . submitted to [the wetlands commission] on October 31, 2001. A requirement of the [wetlands commission] was that before they acted on such a submission, the signatures of all property owners [were] to be obtained where the taking of easements were necessary. In one instance, a property owner had filed for bankruptcy and, in another, the property owner had died and an estate was opened. . . . [A]t the time of trial, it appeared that these problems were resolving themselves."

purposes. . . . It is fundamental that the issuance of the writ rests in the discretion of the court, not an arbitrary discretion exercised as a result of caprice but a sound discretion exercised in accordance with recognized principles of law. . . . That discretion will be exercised in favor of issuing the writ only where the plaintiff has a clear legal right to have done that which he seeks. . . . The writ is proper only when (1) the law imposes on the party against whom the writ would run a duty the performance of which is mandatory and not discretionary; (2) the party applying for the writ has a clear legal right to have the duty performed; and (3) there is no other specific adequate remedy." (Internal quotation marks omitted.) *Miles* v. *Foley*, 253 Conn. 381, 391, 752 A.2d 503 (2000). "Even satisfaction of this demanding [three-pronged] test does not, however, automatically compel issuance of the requested writ of mandamus. . . . In deciding the propriety of a writ of mandamus, the trial court exercises discretion rooted in the principles of equity." (Citation omitted.) *Hennessey* v. *Bridgeport*, 213 Conn. 656, 659, 569 A.2d 1122 (1990). We review the trial court's decision, therefore, to determine whether it abused its discretion in denying the writ.

"In an equitable proceeding, the trial court may examine all relevant factors to ensure that complete justice is done. . . . The determination of what equity requires in a particular case, the balancing of the equities, is a matter for the discretion of the trial court." (Internal quotation marks omitted.) *Northeast Savings, F.A.* v. *Hintlian*, 241 Conn. 269, 275, 696 A.2d 315 (1997). "In determining whether the trial court abused its discretion, this court must make every reasonable presumption in favor of its action." (Internal quotation marks omitted.) *Yanow* v. *Teal Industries, Inc.*, 196 Conn. 579, 583, 494 A.2d 573 (1985).

I

As an initial matter, we must clarify the nature of AvalonBay's third application to the commission. In its amended prayer for relief, AvalonBay had sought a writ of mandamus "ordering the [commission] to approve the *connection* of the proposed . . . development . . . in accordance with [its] July 19, 2001 application . . . ."[8] (Emphasis added.) On appeal, however, AvalonBay characterizes its third application alternatively as one for "the *connection* of its proposed development to the . . . sanitary sewer system," and as one for "the *extension* of [the city's] public sewer system to serve AvalonBay's proposed residential development." (Emphasis added; internal quotation marks omitted.) The commission classifies AvalonBay's application as one to construct an extension of the public sewer system, and not one for a mere connection to that system. We agree with the commission's classification.

A review of AvalonBay's application to the commission, as well as its complaint in the present mandamus action, makes clear that it was seeking to construct an extension of the public sewer system, and not attempting merely to connect to the existing system. As counsel for AvalonBay wrote in a letter to the commission in support of the July 19, 2001 application: "AvalonBay proposes to connect to the [c]ity sewer system by paying for completion of the extension of the sewer line in Wolf Harbor Road which the [c]ity has already begun," and halted, under contract No. 1998-1. (Emphasis added.) Subsequently, AvalonBay filed its complaint in the present action, asserting that "[n]o rule, regulation, policy or custom of the . . . [c]ommission empowers it to prohibit a property owner, at its

---

[8] The trial court interpreted AvalonBay's mandamus action as seeking "an order directing the [commission] to permit the connection of [its] development to the [city] sewer system."

own cost, from *extending a sewer line within a public right-of-way* for a sewer connection that is otherwise in full compliance with [c]ommission requirements." (Emphasis added.) Both of these documents demonstrate that AvalonBay was seeking to complete an extension of the public sewer system in the city.

Moreover, in response to an order of the trial court, AvalonBay filed an amended prayer for relief that provided a more detailed description of the proposed connection than it had provided in its amended complaint. See footnote 6 of this opinion. More specifically, in its amended prayer for relief, AvalonBay provided three detailed options for connecting the proposed development to the sewer system, all of which it offered to construct and pay for itself. Of these three options, the first two proposed to connect at the spot where the work under contract No. 1998-1 was terminated—down Wolf Harbor Road at station 12-40.[9] Essentially, under these two options AvalonBay was requesting permission to complete, at its own expense, the work that remained under contract No. 1998-1. The third option proposed to connect to a location on Wheeler's Farm Road that had been identified as a possible sewer location in the preliminary design under contract No. 2000-1.[10] That third option also stated, however, that if the commission "has not commenced the installation of a

[9] Although both of these options sought to connect at station 12-40, the first option comported with the plans set forth in contract No. 1998-1, while the second option incorporated the preliminary design from contract No. 2000-1. Despite this difference, both options were premised on AvalonBay constructing a gravity sewer line to station 12-40 underneath Wolf Harbor Road.

[10] At the time of the trial in the present action, the preliminary design under contract No. 2000-1 had not yet been finalized or presented to the commission. The trial court noted in its memorandum of decision, however, that the "[e]vidence disclosed that AvalonBay [had] subpoenaed from the consultants [working on contract No. 2000-1] the preliminary designs and based [its] applications on these preliminary designs and not on any final design approved by the commission."

sewer line in Wheeler's Farm Road at the time that AvalonBay obtains a zoning permit for [the proposed development], the [c]ommission shall approve the connection of the [development] to the sewer system via [the prior two options]." All three of these options explicitly demonstrate that AvalonBay was seeking to construct an extension of the sewer system. The fact that AvalonBay offered both to pay for and to complete the work envisioned by all three of these options does not transform its application into one for a mere connection. Under § 23-37[11] of the Milford code, AvalonBay already was responsible for the complete cost of connecting its proposed development to the sewer system. Therefore, by offering to pay for all of the costs related to all three of its options, AvalonBay implicitly concedes that it was seeking more than a connection to the public sewer. Moreover, the fact that all three of the options were modeled on designs for a public sewer system, would run underneath a public street,[12] and would become part of the public sewer system upon completion lead inexorably to the conclusion that AvalonBay was seeking to construct an extension of the city sewer system. See *BRT General Corp.* v. *Water Pollution Control Authority*, 265 Conn. 114, 117 n.6, 826 A.2d 1109 (2003) (noting that, although entitled application to " 'connect' " to sewer system, trial court found "that the application was for an 'extension' of the sewer system").

---

[11] Section 23-37 of the Milford code provides: "All costs and expense[s] incident to the installation and connection of the building sewer shall be borne by the owner. The owner shall indemnify the city for any loss or damage that may directly or indirectly be occasioned by the installation of the building sewer."

A "[b]uilding sewer" is defined in § 23-12 of the Milford code as "[t]he extension from the building drain to the public sewer or other place of disposal . . . ."

[12] As counsel for AvalonBay conceded at oral argument before this court, the extensions discussed in the amended prayer for relief would have gone underneath public streets, and not across private property, at a distance between 1500 and 2000 feet.

## II

The trial court determined that the commission's decision to table AvalonBay's third application until completion of the plans under contract No. 2000-1 was a proper exercise of its discretion. AvalonBay now claims that the trial court improperly failed to determine, as an initial matter, whether the commission had any discretion to exercise in connection with the application. More specifically, AvalonBay claims that because its application complied with all applicable regulations, the commission's duty to approve the application was mandatory and not discretionary. The commission contends that, because AvalonBay's application was for an extension of the sewer system, and not a mere connection to the existing system, the application did not comply with its regulations, and, therefore, it had discretion to table it until completion of the new plans. We agree with the commission.[13]

---

[13] In its brief and at oral argument before this court, AvalonBay has characterized its application as one for "conditional" or "conceptual" approval for connection, and not one seeking actual permission to begin construction immediately. We interpret the trial court's memorandum of decision, however, as implicitly rejecting this assertion, and treating AvalonBay's application as one for actual approval to begin immediate construction, subject only to approval from the other municipal boards. Because we conclude that the commission had discretion to address the application to construct an extension of the public sewer system, we need not address AvalonBay's claim that the commission lacks discretion to address an application for "conceptual" approval to *connect* to the public sewer system. It is clear, however, that "the party applying for the writ [must demonstrate] *a clear legal right* to have the duty performed . . . ." (Emphasis added; internal quotation marks omitted.) *Miles* v. *Foley*, supra, 253 Conn. 391. We question whether an application merely seeking conceptual approval for some future connection, and not the enforcement of an actual right to connect to the public sewer system, would justify the issuance of the extraordinary remedy of a writ of mandamus. See *Russo* v. *Common Council*, 80 Conn. App. 100, 106 n.4, 832 A.2d 1227 (2003) ("[A] mandamus cannot run indefinitely into the future. A writ of mandamus enforces a complete and immediate right, the existence of which is uncontested."). Although the commission could grant such conceptual approval if it desired, and indeed it may have granted such approval in the past, it seems unlikely that an application for conceptual approval would present one of the " 'limited circumstances' " in which a

It is axiomatic that "[t]he duty [that a writ of mandamus] compels must be a ministerial one; the writ will not lie to compel the performance of a duty which is discretionary." *Beccia* v. *Waterbury*, 185 Conn. 445, 453, 441 A.2d 131 (1981). "Consequently, a writ of mandamus will lie only to direct performance of a ministerial act which requires no exercise of a public officer's judgment or discretion. . . . Furthermore, where a public officer acts within the scope of delegated authority and honestly exercises her judgment in performing her function, mandamus is not available to review the action or to compel a different course of action." (Citation omitted; internal quotation marks omitted.) *Clark* v. *Gibbs*, 184 Conn. 410, 419, 439 A.2d 1060 (1981). "Discretion is determined from the nature of the act or thing to be done rather than from the character of the office of the one against whom the writ is directed." 52 Am. Jur. 2d 316–17, Mandamus § 49 (2000). Because we have concluded that AvalonBay's application was for the construction of an extension of the public sewer system in the city, we must review the general nature of such an activity in order to ascertain whether the commission had discretion to table AvalonBay's application.

Our Appellate Court addressed a similar question in *Archambault* v. *Water Pollution Control Authority*, 10 Conn. App. 440, 523 A.2d 931 (1987). In that case, although the surrounding roads were being provided with sewer service, the water pollution control authority of the town of Waterford had assigned a low priority to the plaintiffs' road, and had not included it in the current round of sewer installations. Id., 441. The plain-

writ of mandamus is available. *Miles* v. *Foley*, supra, 391. In addition, we note that the Milford code appears to address only applications for actual approval, not applications for conceptual approval, of some future project. See, e.g., § 23-32 of the Milford code ("[u]pon approval of the application and plan, a permit shall be issued to have the work performed by the stated contractor").

tiffs brought an action seeking a writ of mandamus "to compel the defendant to make provisions for the furnishing of sewer service" to their road. Id. The trial court found that § 16-9 of the Waterford code imposed a mandatory duty upon the defendant to install the sewer service extension to the plaintiffs' road. Id., 443. The Appellate Court reversed the trial court, finding that because the installation of sewers was planned for the plaintiffs' road in the future, "[t]he advancement of that time by the [trial] court was in error" because §§ 16-91 and 16-92 of the Waterford code retained the town's discretionary authority over where and when to construct sewer extensions. Id., 445. In addition, the Appellate Court stated the following proposition: "It is well settled that a municipality has wide discretion in connection with the decision to supply sewerage. . . . Although this discretion is not absolute, [t]he date of construction, the nature, capacity, location, number and cost of sewers and drains are matters within the municipal discretion with which the courts will not interfere, unless there appears fraud, oppression or arbitrary action. Accordingly, mandamus or a mandatory injunction will not issue in such case." (Citation omitted; internal quotation marks omitted.) Id., 444, quoting 11 E. McQuillin, Municipal Corporations (3d Ed. Rev. 1977) § 31.17.

Similarly, in *Vicksburg* v. *Vicksburg Waterworks Co.*, 202 U.S. 453, 471–72, 26 S. Ct. 660, 50 L. Ed. 1102 (1906), the Circuit Court had ordered the municipality to extend its sewer system and construct a new outlet for discharging sewage into either the Yazoo River or the Mississippi River. The United States Supreme Court held that the Circuit Court "had no authority to issue a mandatory injunction requiring the city to construct a sewer, irrespective of the exercise of discretion vested by law in the municipal authorities to determine the practicability of the sewer ordered, the availability of taxation for the purpose, and the like matters; and we

think that the exercise of this authority is primarily vested in the municipality and not in the courts." Id., 472; see also *Stephenson* v. *Common Council*, 213 Mich. 668, 672, 181 N.W. 1001 (1921) (reversing order of writ of mandamus; finding that duty to construct public sewer "will not be controlled by mandamus" [internal quotation marks omitted]); *Miller* v. *Brentwood*, 548 S.W.2d 878, 883 (Tenn. App. 1977) ("there is no authority for compelling a city to construct an artificial drainage sewer; and it would be a radical, dangerous and undemocratic precedent for the [c]ourts to undertake to enter into municipal legislation and administration in any such respect"); *State ex rel. Vanderwall* v. *Mayor and Common Council*, 134 Wis. 437, 442, 114 N.W. 802 (1908) ("[t]he duty of providing for and constructing sewers by a municipality is a quasi judicial or legislative power involving judgment and discretion . . . [and such] duty will not be controlled by mandamus" [citations omitted]); 52 Am. Jur. 2d, supra, § 225 ("mandamus does not lie to control municipal discretion with respect to the construction or extension of sewer systems"). The conclusions reached in *Vicksburg* and *Archambault* are instructive to our resolution of the present case.[14]

[14] AvalonBay claims that *Schuchmann* v. *Milford*, 44 Conn. App. 351, 689 A.2d 513, cert. denied, 240 Conn. 924, 692 A.2d 818 (1997), should guide our resolution of the present case. We are unpersuaded. In *Schuchmann*, the plaintiff sought a writ of mandamus ordering the defendant sewer commission of the city of Milford to approve her application for a sewer permit for her property. Id., 352. The commission denied that application, citing concerns about discharge from an adjoining piece of property also owned by the plaintiff. Id. The trial court concluded that the regulations did not prohibit the issuance of a sewer permit for that property based on concerns relating to another piece of property, and ordered the commission to issue the permit. Id. On appeal, the Appellate Court affirmed the trial court, stating: "The commission had no discretion to refuse to issue a permit when the application complied with the regulations that it had promulgated . . . ." Id., 358. *Schuchmann* is distinguishable because in that case it was clear that the plaintiff's application complied with all of the terms of the regulations governing the connection of a property to the public sewer. In the present case, however, AvalonBay is seeking to construct an extension of the public

"It is settled law that as a creation of the state, a municipality has no inherent powers of its own. . . . A municipality has only those powers that have been expressly granted to it by the state or that are necessary for it to discharge its duties and to carry out its objects and purposes. . . . This principle applies with equal force to quasi-municipal corporations. . . . A sewer district established under chapter 105 of the General Statutes is a quasi-municipal corporation . . . which, through its sewer authority, has the power to acquire, construct, maintain, supervise, manage and operate a sewer system and perform any act pertinent to the collection, transportation and disposal of sewage. General Statutes 7-245 . . . ." (Citations omitted; internal quotation marks omitted.) *Wright* v. *Woodridge Lake Sewer District*, 218 Conn. 144, 148–49, 588 A.2d 176 (1991). "The charter of the city of Milford provides for the appointment of a sewer commission of five members and vests in that commission 'all the rights, duties and authority of sewer commissions as set out in the general statutes.' Milford City Charter, art. IV, § 9. That commission also acts as the city's water pollution control authority pursuant to General Statutes § 7-247[15]

sewer system at its own expense, an activity that is not provided for in the regulations. Moreover, in *Schuchmann*, there was evidence that the plaintiff's building was already connected to the sewer system, and had been allowed to use the system in the past. Id., 353. That is clearly not the factual situation found in the present appeal.

[15] General Statutes § 7-247 provides: "Any municipality by its water pollution control authority may acquire, construct and operate a sewerage system or systems; may enter upon and take and hold by purchase, condemnation or otherwise the whole or any part of any real property or interest therein which it determines is necessary or desirable for use in connection with any sewerage system; may establish and revise rules and regulations for the supervision, management, control, operation and use of a sewerage system, including rules and regulations prohibiting or regulating the discharge into a sewerage system of any sewage or any stormwater runoff which in the opinion of the water pollution control authority will adversely affect any part or any process of the sewerage system; may enter into and fulfill contracts, including contracts for a term of years, with any person or any other municipality or municipalities to provide or obtain sewerage

. . . ." *Schuchmann* v. *Milford*, 44 Conn. App. 351, 355, 689 A.2d 513, cert. denied, 240 Conn. 924, 692 A.2d 818 (1997). Specifically, § 7-247 grants a water pollution control authority (authority), such as the commission in the present case, the ability to "acquire, construct and operate a sewerage system or systems . . . ." In furtherance of those powers, § 7-247 also provides that an authority "may establish and revise rules and regulations for the *supervision, management, control, operation and use* of a sewerage system . . . ." (Emphasis added.) See also *Wright* v. *Woodridge Lake Sewer District*, supra, 149 ("[t]he power to construct, establish and maintain drains and sewers includes power to make reasonable regulations for *tapping and connecting* with the sewers" [emphasis added; internal quotation marks omitted]). Therefore, although the legislature has granted an authority the ability to "acquire, construct and operate" a sewer system, it only included the power for "operation and use" within the authority's power to issue rules and regulations.[16] General Statutes § 7-247. Because the legislature did not explicitly subject an authority's ability to "acquire" or "construct" a sewer system to the issuance of rules and regulations, as it did for the operation and use of the sewer system, we infer that the legislature intended for such authorities

system service for any sewage, and may make arrangements for the provision or exchange of staff services and equipment with any person or any other municipality or municipalities, or for any other lawful services. The water pollution control authority of any municipality planning to acquire, construct or operate a new or additional sewerage system shall consider the feasibility of using the sewage collected by such system as an energy source for the generation of electricity or the production of other energy sources. The water pollution control authority may establish rules for the transaction of its business. It shall keep a record of its proceedings and shall designate an officer or employee to be the custodian of its books, papers and documents."

[16] See R. Fuller, 9 Connecticut Practice Series: Land Use Law and Practice (1999) § 12.4, p. 281 (water pollution control authority "is authorized to *acquire, construct and operate* a sewerage system within the municipality and can establish and revise rules and regulations for the *management, operation and use* of a sewerage system" [emphasis added]).

to retain the discretionary power needed to fulfill those two objectives.[17] See *Wright* v. *Woodridge Lake Sewer District*, supra, 149 ("municipality has wide discretion in connection with the decision to supply sewerage" [internal quotation marks omitted]); *Hartford* v. *American Arbitration Assn.*, 174 Conn. 472, 479, 391 A.2d 137 (1978) ("[w]hen a general power is given to a municipal officer, whatever is necessary for effective exercise of that power is, in the absence of express authority, conferred by implication"); 11 E. McQuillin, Municipal Corporations (3d Ed. Rev. 2000) § 31.10.10, pp. 199–200 ("A grant of power for sewer construction and maintenance should be liberally construed for the accomplishment of the purposes intended. . . . The municipality within the scope of the power conferred has reasonable discretion to act for the public welfare."). Simply put, under § 7-247, an authority may exercise its discretionary ability to acquire[18] or construct[19] a municipal sewer system without first having to issue rules and regulations governing such a process. This conclusion is buttressed by a reference to General Statutes § 7-247a,[20] which

[17] AvalonBay also claims that the commission's prior approval of requests similar to the one set forth in its current application demonstrates that the application fully complied with all applicable regulations. We disagree, as evidence of prior approvals by the commission of similar applications does not reflect on the issue before us in the present appeal, namely, whether the commission had discretion to exercise concerning the application. To the contrary, such evidence would more appropriately be considered on a claim that the commission, if it had discretion to exercise, did so in an unlawful or arbitrary manner.

[18] General Statutes § 7-245 defines " 'acquire a sewerage system' " as to "obtain title to all or any part of a sewerage system or any interest therein by purchase, condemnation, grant, gift, lease, rental or otherwise . . . ."

[19] General Statutes § 7-245 defines " 'construct a sewerage system' " as meaning "to acquire land, easements, rights-of-way or any other real or personal property or any interest therein, plan, construct, reconstruct, equip, extend and enlarge all or any part of a sewerage system . . . ."

[20] General Statutes § 7-247a provides: "No municipal water pollution control authority shall acquire or construct all or any part of a sewerage system until after a public hearing at which the affected property owners of the municipality shall have an opportunity to be heard concerning the proposed acquisition or construction. Notice of the time, place and purpose of such

provides that "[n]o . . . authority shall acquire or construct all or part of a sewerage system until after a public hearing at which the affected property owners of the municipality shall have an opportunity to be heard concerning the proposed acquisition or construction. . . ." See R. Fuller, 9 Connecticut Practice Series: Land Use Law and Practice (1999) § 12.4, p. 282 (same). As this statute demonstrates, it is the *authority's* decision to acquire or construct a public sewer system that is subject to a public hearing, not the decision of a private developer. Consequently, even if the commission in the present case did want to grant AvalonBay the ability to construct the desired extension, that decision could not be made on the application alone.

The provisions of the Milford code that relate to the sewer system mirror the language and structure of General Statutes §§ 7-245 through 7-273a. In accordance with the general grant of powers set forth in § 7-247, § 23-14 of the Milford code provides that "[t]he construction, extension, maintenance and operation of the sewerage system of the city and connections therewith . . . shall be subject to the provisions of this article . . . ." Moreover, in accordance with the grant of power to establish rules and regulations set forth in § 7-247, § 23-32[21] of the Milford code, which is entitled "[c]on-

hearing shall be mailed not later than fifteen days before the date of the hearing by certified mail, return receipt requested, to the owner of any property to be taken for the proposed acquisition or construction at such owner's address as shown in the last-completed grand list of the municipality or at any later address of which the water pollution control authority may have knowledge, and shall be published at least ten days before the date thereof in a newspaper having a general circulation in the municipality."

[21] Section 23-32 of the Milford code provides: "A person intending to connect a building drain from his property to the public sewer shall first obtain a permit to connect from the authority. The application shall be made on forms provided by the authority, and it shall be accompanied by a sketch or plan showing the proposed installation in sufficient detail to enable the authority to determine that the proposed installation meets the requirements of this regulation and other applicable specifications, codes and laws. The application shall be signed by the owner of the premises to be served or his authorized agent and by the qualified contractor who has been chosen .

nection permit required," provides that "[a] person intending to *connect a building drain*[22] from his property *to the public sewer* shall first obtain a *permit to connect* from the [commission]. . . ." (Emphasis added.) Section 23-32 of the Milford code further provides that "[t]he application shall be signed by . . . the qualified contractor who has been chosen to perform the work of *installing and connecting* the building drain *to* the public sewer. . . ." (Emphasis added.) There is no comparable section addressing an application to construct an extension of the public sewer system. Thus, the plain language of § 23-32 of the Milford code reveals that it pertains only to the ability of a property owner to connect a building drain to the municipal sewer system, and does not pertain to the extension of that system. We conclude that AvalonBay's claim that its application for the construction of an extension of the municipal sewer system complied with § 23-32 of the Milford code is, therefore, without merit. Accordingly, the trial court properly determined that the commission had discretion to table AvalonBay's third application.[23]

---

to perform the work of installing and connecting the building drain to the public sewer. Upon approval of the application and plan, a permit shall be issued to have the work performed by the stated contractor. In the event the premises changes ownership before the work is completed, or if another contractor is chosen to perform or finish the work, the original permit becomes void, and a new permit must be obtained by the new parties in interest."

[22] See footnote 11 of this opinion.

[23] Section 23-32 of the Milford code also requires that the application be on the forms provided by the commission. The main application form requires that an applicant identify whether they are requesting a "New Sewer *Connection*" or a "Repair or Replacement of Old Sewer *Connection*." (Emphasis added.) There is no option for requesting to construct an extension of the sewer system. Moreover, the specific application form for commercial, industrial and multifamily developments, which AvalonBay filed for its proposed development, is entitled an "application for sewer *connection*," and it makes no reference to the construction of an extension to the sewer system. (Emphasis added.)

## III

AvalonBay next claims that, even if we were to assume that the commission had the authority to table AvalonBay's application on the basis of concerns regarding safety and cost, the trial court's findings as to the legitimacy of those reasons are clearly erroneous. Because of our conclusion in part II of this opinion, we need not review this claim. More specifically, we have concluded that the commission had discretion to act upon applications seeking to extend the municipal sewer system. See General Statutes § 7-247; *Vicksburg* v. *Vicksburg Waterworks Co.*, supra, 202 U.S. 472. "[W]here a public officer [or board] acts within the scope of delegated authority and honestly exercises her judgment in performing her function, mandamus is not available to review the action or to compel a different course of action." *Clark* v. *Gibbs*, supra, 184 Conn. 419; see also 11 E. McQuillin, Municipal Corporations (3d Rev. 2000) § 31.17, pp. 219–20 (discretionary decisions regarding sewer construction not reviewable "unless there appears fraud, oppression or arbitrary action").

In the present case, AvalonBay sought a writ of mandamus based upon its claim that its third application complied with the regulations governing connections to the public sewer system, and, therefore, that the commission lacked discretion to table its application. In its memorandum of decision, the trial court noted that the commission's progress with the expansion of the sewer system was "obviously not at a rate acceptable to AvalonBay." At no point, however, did AvalonBay claim to the trial court that a writ of mandamus was appropriate because the commission was exercising its discretion in an illegal, fraudulent or arbitrary manner. Thus, once the trial court found that the commission had discretion to table the application for construction of an extension of the public sewer system, the court should have denied the writ of mandamus.

Accordingly, any findings made by the trial court concerning the reasons behind the commission's exercise of discretion were unnecessary, and we need not review them.

## IV

AvalonBay's final claim is that the commission's decision to table its third application thwarts this state's public policy supporting the development of affordable housing. More specifically, AvalonBay claims that the trial court improperly failed to reconcile the statutes governing water pollution control authorities with statutes encouraging the development of affordable housing.[24] The commission contends that the affordable housing statutes do not apply to a water pollution control authority, and, therefore, the trial court properly denied AvalonBay's request for a writ of mandamus. We agree with the commission.

Affordable housing is a goal that has long been recognized by the legislature as constituting a substantial public interest. See, e.g., General Statutes § 8-119bb (declaration of policy on housing for low income persons). Consequently, title 8 of our General Statutes, which is entitled "Zoning, Planning, Housing, Economic and Community Development and Human Resources," is replete with legislative initiatives aimed at, inter alia, increasing "the construction of new housing or rehabilitation of existing housing accommodations to provide

---

[24] We agree that the trial court did not analyze the relationship between the affordable housing statutes and the water pollution control authority statutes within its memorandum of decision. We note, however, that the trial court was cognizant of this issue, and concluded that "[w]hile the issue of affordable housing underlies this matter, there is no evidence that the [commission] is guilty of any illegal or arbitrary action taken in an effort to derail the development." Although AvalonBay alleges that the commission has been unfairly dilatory in addressing its application, it has not alleged that any illegal or arbitrary considerations relating to the affordable housing component of the proposed development underlie this delay.

safe and sanitary dwelling facilities for low income persons . . . ." General Statutes § 8-119bb (3); see also General Statutes § 8-2g (allowing for special exemption from density limits for construction of affordable housing); General Statutes § 8-30g (providing procedure for affordable housing land use appeals). In none of these statutes, however, has the legislature explicitly extended the affordable housing requirements and considerations to the powers granted to water pollution control authorities under title 7 of the General Statutes. Further, in chapter 126a of title 8 of the General Statutes, the legislature expressly defined a " '[c]ommission' " subject to affordable housing land use appeals to include "a zoning commission, planning commission, planning and zoning commission, zoning board of appeals or municipal agency exercising zoning or planning authority . . . ." General Statutes § 8-30g (a) (4).[25] Consequently, we conclude that the legislature has not required water pollution control authorities to treat applications related to developments with affordable housing components differently from applications for

---

[25] Indeed, a review of the legislative history behind Public Acts 1989, No. 89-311, which enacted the definition of " '[c]ommission' " set forth in § 8-30g (a) (4), reveals that inland wetlands agencies were originally included in that definition, and subsequently were removed prior to its enactment. See Conn. Joint Standing Committee Hearings, Planning and Development, Pt. 1, 1989 Sess., p. 253, remarks of Terry Tondro, cochair of the land use subcommittee for the blue ribbon housing commission (noting that wetlands agencies are included in definition of commission); id., pp. 249–50, remarks of Karl Wagener, executive director of the council on environmental quality (testifying about concern of subjecting inland wetlands agencies to provisions of Public Act 89-311); 32 H.R. Proc., Pt. 30, 1989 Sess., pp. 10604–10605 (discussion confirming removal of inland wetlands agencies from definition of commission). We view this substantive change as further evidence that the definition of commission was specifically and intentionally limited to commissions covered by title 8 of the General Statutes, and, therefore, not applicable to water pollution control authorities covered by title 7 of the General Statutes.

other types of developments, as it has with other municipal bodies.[26]

The judgment is affirmed.

In this opinion the other justices concurred.

[26] AvalonBay has not alleged that the affordable housing component of its proposed development affected the commission's exercise of its discretion. Nevertheless, we emphasize that this "discretion must be exercised under the law and not contrary thereto, and it must not be arbitrary, vague, or fanciful but legal, regular, and sound discretion governed by rule and exercised under the established principles of law." 52 Am. Jur. 2d, supra, § 51; see also 9 R. Fuller, supra, § 12.4, p. 284 ("[i]t is questionable whether [a water pollution control authority] can arbitrarily refuse to extend sewers just to prevent development otherwise authorized by the zoning regulations, and denial of an extension would have to be based on topographical or engineering considerations, the terms of the sewer ordinance, a prior schedule for specific sewer extensions, or similar standards").