FOREST WALK, LLC *v.* WATER POLLUTION
CONTROL AUTHORITY OF THE TOWN
OF MIDDLEBURY
(SC 18239)

Rogers, C. J., and Katz, Palmer, Vertefeuille and Zarella, Js.

Argued January 8—officially released April 21, 2009

*Julia B. Morris*, with whom, on the brief, was *Michael D. O'Connell*, for the appellant (plaintiff).

*Maureen Danehy Cox*, with whom were *Jennifer Sills Yoxall* and, on the brief, *Kenneth J. Pocius*, for the appellee (defendant).

*Opinion*

KATZ, J. The plaintiff, Forest Walk, LLC, appeals from the judgment of the trial court dismissing its appeal from the decision of the defendant, the water pollution control authority of the town of Middlebury, denying the plaintiff's applications for a sewer connection and a sewer extension.[1] On appeal, the plaintiff claims that the trial court reviewed the defendant's decision under an improperly deferential standard because that court failed to recognize that Public Acts 2003, No. 03-177, § 13 (P.A. 03-177),[2] changed the substantive law governing water pollution control authorities by limiting their discretion in the same manner that the legislature lim-

[1] The plaintiff filed a petition for certification in the Appellate Court to appeal from the judgment of the trial court pursuant to General Statutes § 8-8 (o), which the Appellate Court granted. We thereafter transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] Public Act 03-177, § 13, effective as of October 1, 2003, and later codified at General Statutes § 7-246a, provides: "(a) Whenever an application or request is made to a water pollution control authority or sewer district for (1) a determination of the adequacy of sewer capacity related to a proposed use of land, (2) approval to hook up to a sewer system at the expense of the applicant, or (3) approval of any other proposal for waste water treatment or disposal at the expense of the applicant, the water pollution control authority or sewer district shall make a decision on such application or request within sixty-five days from the date of receipt, as defined in subsection (c) of section 8-7d of the general statutes, as amended by this act, of such application or request. The applicant may consent to one or more extensions of such period, provided the total of such extensions shall not exceed sixty-five days.

"(b) Notwithstanding any other provision of the general statutes, an appeal may be taken from an action of a water pollution control agency or sewer district pursuant to subsection (a) of this section in accordance with section 8-8 of the general statutes."

ited the discretion of land use boards. The plaintiff also contends that the trial court improperly concluded that the defendant's denials of its applications were neither contrary to its regulations nor the result of arbitrary, unfair action in abuse of its discretion. We conclude that P.A. 03-177 did not change the substantive law governing water pollution control authorities and that the trial court properly found that the defendant's denials of the plaintiff's applications for a sewer extension and a sewer connection were not contrary to its regulations, were supported by substantial evidence and were not the result of arbitrary, unfair action in abuse of its discretion. We therefore affirm the judgment of the trial court.

The record reveals the following undisputed facts and procedural history. The plaintiff is the owner of a nineteen acre parcel of land (property) located on the east side of Regan Road in the town of Middlebury (town). Pursuant to General Statutes § 7-246,[3] the town

[3] General Statutes § 7-246 provides in relevant part: "(a) Any municipality may, by ordinance, designate its legislative body . . . or create a new board or commission to be designated, as the water pollution control authority for such municipality. . . . The water pollution control authority of the town within which there is a city or borough shall not exercise any power within such city or borough without the express consent of such city or borough, except that such consent shall not be required for any action taken to comply with a pollution abatement order issued by the Commissioner of Environmental Protection.

"(b) Each municipal water pollution control authority designated in accordance with this section may prepare and periodically update a water pollution control plan for the municipality. Such plan shall designate and delineate the boundary of: (1) Areas served by any municipal sewerage system; (2) areas where municipal sewerage facilities are planned and the schedule of design and construction anticipated or proposed; (3) areas where sewers are to be avoided; (4) areas served by any community sewerage system not owned by a municipality; (5) areas to be served by any proposed community sewerage system not owned by a municipality; and (6) areas to be designated as decentralized wastewater management districts. Such plan shall also describe the means by which municipal programs are being carried out to avoid community pollution problems and describe any programs wherein the local director of health manages subsurface sewage disposal systems. The authority shall file a copy of the plan and any periodic updates of such

maintains a public sewer system controlled by the defendant that services a portion of the town.

On December 19, 2003, the plaintiff filed two applications with the defendant for sewer service to its property. One application sought a connection to an existing sewer interceptor on Porter Road through neighboring property that abutted the existing sewer contained in Porter Road. The plaintiff had obtained an easement over that property through which it intended for the connection to the sewer interceptor to be made. The other application sought an extension to its property of the existing sewer line on Regan Road, which terminates approximately 500 feet from the plaintiff's property. The applications specified that the sewer would service a residential development containing 650 bedrooms[4] and requested a sewage capacity of 50,505 gallons per day.

After a series of denials of applications and subsequent appeals, the parties ultimately entered into a settlement agreement under which the applications were accepted by the defendant on November 15, 2005.[5] At

plan with the Commissioner of Environmental Protection and shall manage or ensure the effective supervision, management, control, operation and maintenance of any community sewerage system or decentralized wastewater management district not owned by a municipality. . . ."

[4] The applications erroneously listed 286, rather than 650, bedrooms, but the plaintiff corrected this error at the initial hearing on its applications held on November 15, 2005.

[5] This case is before this court for the second time. See *BRT General Corp.* v. *Water Pollution Control Authority*, 265 Conn. 114, 826 A.2d 1109 (2003). Beginning in 2000, the plaintiff and its predecessor in ownership, BRT General Corporation (BRT), had begun discussions with the defendant concerning approvals to develop the property. Id., 120–21. In 2001, BRT filed an application with the defendant, which the defendant ultimately rejected, stating that it saw no reason to " 'entertain' " an extension of the sewer. Id. The plaintiff appealed from that decision and, ultimately, this court concluded that the trial court lacked jurisdiction to consider all but one of the plaintiff's claims because, prior to taking the appeal, the plaintiff had not exhausted its administrative remedies by requesting a hearing before the commissioner of environmental protection, as authorized under General Statutes § 22a-430 (f). Id., 122–23. On October 1, 2003, after this court had

that time, the plaintiff indicated that it had submitted applications for both a connection and an extension because it was uncertain how the defendant would classify the service at issue, but that it understood that, once the defendant had determined how service would be provided, only the pertinent application would be relevant to subsequent discussions.

The defendant held further hearings on the applications on January 17 and January 19, 2006, and denied both applications by way of a resolution dated January 19, 2006. The defendant noted at the outset of the resolution that it carefully had considered the testimony of its consulting engineer, Michael J. Angieri, who had reviewed the applications. Angieri had informed the defendant that the property is not located in the town's planned service area and that sewer service to the property would require an extension of the sewer system to service the property pursuant to article III, § 6, of the regulations of the Middlebury water pollution control authority (regulations).[6] Angieri also noted that article

rendered judgment in that case, P.A. 03-177 took effect, expressly authorizing appeals from decisions of water pollution control authorities directly to the Superior Court. See footnote 2 of this opinion.

On November 18, 2003, the defendant imposed a moratorium on applications and in May, 2004, amended its regulations to address any changes necessitated by P.A. 03-177. Notwithstanding the moratorium, on December 19, 2003, the plaintiff filed the two applications at issue in this appeal. Following legal action, in which the trial court determined that the moratorium had been enacted improperly; *Forest Walk, LLC* v. *Water Pollution Control Authority*, Superior Court, judicial district of Danbury, Docket No. CV 04-0351456-S (March 29, 2005); the parties entered into a settlement agreement under which the applications would be considered under the regulations in effect on December 19, 2003. Thus, the parties have stipulated that the regulations, as amended in 1997, govern this appeal. Therefore, all references in this opinion to the town's regulations shall be to the regulations as amended in 1997.

[6] Article III, § 6, of the Middlebury water pollution control authority regulations provides in relevant part: "Where the developer of property or a subdivision is not required to connect under the provisions of [article III, § 5] above, he may at his option submit a written application to [the defendant] to come within such provisions by constructing a new public sewer line connecting the property or subdivision's main sewer line with the existing public sewer.

III, § 5, of the regulations,[7] which provides for connections to public sewers, was not intended for properties "other than those that are located in or near an area already planned for sewers or to require the [defendant] to connect to and provide unplanned capacity to a property because an owner has the ability by easement(s) to reach a sewer interceptor . . . ." In reliance on Angieri's testimony, the defendant denied both applications, finding that both applications sought, essentially, an extension of the sewer system to serve the property. It then enumerated several reasons for denying the applications, including: the property was not located in an area designated for sewer service; the sewage capacity requested by the plaintiff was disproportionately large for the size of the parcel; and an extension was contrary to the town's long-standing policy of sewer avoidance. In reaching these conclusions, the defendant relied on, inter alia, its regulations, its 1967 master plan of sewer development (1967 master plan) and its 1991 sewer plan (1991 plan), the latter of which set forth plans for the next twenty years and which emphasized the avoidance of additional sewers and sewer expan-

Such application shall meet all of the provisions of [article III, § 5], and in addition shall show approvals of any necessary easements across private property and shall identify owners of the property abutting the new public sewer. The owners of the property abutting the new public sewer may indicate their assent or dissent to its construction in a writing made part of the [p]ermit [a]greement required by [article III, § 5] above. [The defendant] will determine whether or not such abutting property is especially benefited by the new public sewer or whether it is primarily for the convenience of the developer in determining whether or not assessment shall be made and whether an order to connect shall be made under [article III, § 3] above. . . ."

[7] Article III, § 5, of the Middlebury water pollution control authority regulations provides in relevant part: "The developer of any property or subdivision consisting of three . . . or more building lots, or a building with three . . . or more units, situated within the [t]own on property abutting on any street, alley or right-of-way in which there is now located, or may in the future be located, a public sewer, is hereby required, at his expense, to connect all sanitary facilities directly with such public sewer in accordance with the provisions of these regulations. . . ."

sion except when necessary to avoid health and safety problems.

Pursuant to P.A. 03-177, which authorizes appeals to the Superior Court in accordance with General Statutes § 8-8,[8] the plaintiff appealed from the defendant's decision to the trial court. The plaintiff claimed that the defendant had acted in an arbitrary and capricious manner and in an abuse of its discretion when it denied the plaintiff's applications. Specifically, it contended that: the reasons given by the defendant in denying its applications were not supported by its regulations; the plain language of the regulations indicates that the property would be, in the plaintiff's view, "encouraged, if not required" to connect to the public sewer; the defendant's reliance on documents and policies not referenced in the regulations "perpetrated an unfair and unreasonable surprise on the plaintiff"; and the denial of its applications was discriminatory because other properties located outside of the designated areas for sewer service had been granted permits for extensions to the sewer system. The plaintiff also claimed that P.A. 03-177 had changed the substantive law applicable to water pollution control authorities, thereby limiting their discretion such that, like land use boards also governed by § 8-8, once such an agency enacts regulations, it may not act contrary to their plain meaning.

In a lengthy memorandum of decision, the trial court dismissed the appeal. The court first concluded that P.A. 03-177 had not changed the substantive law applicable to water pollution control authorities. Thus, contrary to the plaintiff's assertions, "water pollution control authorities are not held to the same principles

---

[8] General Statutes § 8-8 sets forth the procedures for and parameters of appeals from the decisions of a "municipal zoning commission, planning commission, combined planning and zoning commission, zoning board of appeals or other board or commission the decision of which may be appealed pursuant to this section . . . ." General Statutes § 8-8 (a) (2).

applied to zoning boards or planning commissions." The trial court concluded that, under this court's case law, water pollution control authorities are afforded broad discretion in deciding whether to provide sewer service to property owners, but cannot exercise that discretion in an arbitrary or discriminatory manner or in contravention of the plain meaning of their regulations.

Applying this standard to the plaintiff's applications, the trial court concluded that the defendant's denials of the two applications were supported by substantial evidence in the record. It noted that the record reflected that the property is not located within an area designated or planned for sewer service. Moreover, the plaintiff had not alleged that the property abuts a road containing a public sewer and, thus, the plaintiff was not entitled to a sewer connection as a matter of right under the regulations. In light of these facts, the court concluded that the defendant's interpretation of the regulations, construing both applications as applications for extensions, did not conflict with the plain meaning of the regulations. It also concluded that more than one of the defendant's reasons for denying the application for the extension—namely, both that the percentage of the town's sewer capacity sought by the applications was excessive with respect to the size of the property and that the defendant had a long established policy of sewer avoidance—were supported by the record. Finally, it determined that the defendant had not applied its regulations in a discriminatory or arbitrary manner because other applications cited by the plaintiff that had been granted for properties located outside of designated sewer areas had presented unique circumstances that both differed from those presented by the plaintiff and had provided additional benefits to the town that the plaintiff's application did not. This appeal followed. See footnote 1 of this opinion.

On appeal, the plaintiff asserts the same claims that it raised before the trial court. We conclude that the trial court properly dismissed the appeal. Additional facts and procedural history will be set forth as necessary.

I

The plaintiff first claims that the trial court improperly determined that P.A. 03-177 did not alter the substantive law governing water pollution control authorities.[9] The plaintiff contends that P.A. 03-177 necessitates that certain fundamental principles applicable to land use agencies, whose decisions also are subject to appeals under § 8-8, must be applicable to water pollution control authorities, "or the right of appeal has no meaning." Specifically, the plaintiff contends that the legislative history of P.A. 03-177 supports the view that, by providing a right of appeal, the legisla-

---

[9] In its brief to this court, the plaintiff contends that "the trial court misstate[d] the plaintiff's position and then reject[ed] it. The plaintiff's position is not that all zoning law is now applicable to water pollution control authorities, but rather that the change in the law . . . granting disappointed applicants the right to appeal certain [water pollution control authority] decisions necessitates that certain fundamental principles must be applicable to [water pollution control authority] operations, or the right of appeal has no meaning. The plaintiff is arguing for the application of fundamental principles of notice, fairness and due process to the [defendant's] operations."

To the extent that the plaintiff, by this general reference, is attempting to raise a claim not raised before the trial court or is claiming that the trial court misunderstood the claim that it had raised previously, it is well established that we construe claims on appeal to this court consistently with the claims made before the trial court and, thus, preserved for appellate review. *State* v. *Allen*, 289 Conn. 550, 560 n.10, 958 A.2d 1214 (2008). Moreover, if the plaintiff believed that the trial court had misconstrued its claim, it was the plaintiff's responsibility to move for an articulation to clarify the basis of the trial court's ruling or to ask for a ruling on any overlooked matter. *Grimm* v. *Grimm*, 276 Conn. 377, 388, 886 A.2d 391 (2005), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006). Accordingly, we construe the plaintiff's claims consistently with those made before the trial court.

ture intended to constrain water pollution control authorities such that, when they promulgate regulations, those regulations must be "reasonably precise . . . and reasonably . . . sufficient to guide the [authority] and to enable those affected to know their rights and obligations," and the authority may not apply the regulations in an arbitrary or discriminatory manner or in contravention of their plain meaning. The plaintiff's claim is without merit.

The trial court's determination that P.A. 03-177 did not change the substantive law governing water pollution control authorities was an issue of statutory construction requiring a conclusion of law. When construing a statute, we adhere to fundamental principles of statutory construction; see General Statutes § 1-2z;[10] see also *Testa* v. *Geressy*, 286 Conn. 291, 308, 943 A.2d 1075 (2008) (setting forth well established rules of construction under which "[o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature" [internal quotation marks omitted]); over which our review is plenary. *State* v. *Arthur H.*, 288 Conn. 582, 590, 953 A.2d 630 (2008).

Before turning to P.A 03-177, we begin with certain fundamental principles governing water pollution control authorities that predate that act. This court has recognized that water pollution control authorities are quasi-municipal corporations created pursuant to statute that may exercise "the power to acquire, construct, maintain, supervise, manage and operate a sewer system and perform any act pertinent to the collection, transportation and disposal of sewage." (Internal quota-

---

[10] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

tion marks omitted.) *AvalonBay Communities, Inc.* v. *Sewer Commission*, 270 Conn. 409, 425, 853 A.2d 497 (2004); *Wright* v. *Woodridge Lake Sewer District*, 218 Conn. 144, 148–49, 588 A.2d 176 (1991). General Statutes § 7-247 (a)[11] defines the powers and duties of water pollution control authorities and provides, inter alia, that they may "establish and revise rules and regulations for the supervision, management, control, operation and use of a sewerage system, including rules and regulations prohibiting or regulating the discharge into a sewerage system of any sewage or any stormwater run-off which *in the opinion of the water pollution control authority* will adversely affect any part or any process of the sewerage system . . . ." (Emphasis added.) Under the terms of the statute, "a municipality has wide discretion in connection with the decision to supply sewerage. . . . Although this discretion is not absolute, [t]he date of construction, the nature, capacity, location, number and cost of sewers and drains are matters within the municipal discretion with which the courts will not interfere, unless there appears fraud, oppression or arbitrary action." (Internal quotation marks omitted.) *AvalonBay Communities, Inc.* v. *Sewer Commission*, supra, 423, quoting *Archambault* v. *Water Pollution Control Authority*, 10 Conn. App. 440, 444, 523 A.2d 931 (1987); see also *Wright* v.

---

[11] General Statutes § 7-247 (a) sets forth certain responsibilities of water pollution control authorities and provides in relevant part: "Any municipality by its water pollution control authority may . . . establish and revise rules and regulations for the supervision, management, control, operation and use of a sewerage system, including rules and regulations prohibiting or regulating the discharge into a sewerage system of any sewage or any stormwater runoff which in the opinion of the water pollution control authority will adversely affect any part or any process of the sewerage system except that any such rule or regulation regarding decentralized systems shall be approved by the local director of health before such rule or regulation may be effective . . . . The water pollution control authority may establish rules for the transaction of its business. It shall keep a record of its proceedings and shall designate an officer or employee to be the custodian of its books, papers and documents. . . ."

*Woodridge Lake Sewer District,* supra, 149 ("a municipality has wide discretion in connection with the decision to supply sewerage" [internal quotation marks omitted]). This discretion extends to the construction or extension of public sewer facilities. See 11 E. McQuillin, Municipal Corporations (3d Ed. Rev. 2000) § 31.10.10, pp. 199–200 ("A grant of power for sewer construction and maintenance should be liberally construed for the accomplishment of the purposes intended. . . . The municipality within the scope of the power conferred has reasonable discretion to act for the public welfare."); *AvalonBay Communities, Inc.* v. *Sewer Commission,* supra, 427 ("an authority may exercise its discretionary ability to acquire or construct a municipal sewer system without first having to issue rules and regulations governing such a process"). Thus, the settled law prior to the enactment of P.A. 03-177 was that water pollution control authorities had broad discretion over their decisions to allocate sewer resources, but that this discretion could not be exercised in an arbitrary or otherwise unlawful manner.

Against this backdrop, we turn to P.A. 03-177. Shortly before the enactment of P.A. 03-177, this court had concluded that parties seeking to appeal to the Superior Court from denials of applications for sewer connections or extensions had to exhaust certain administrative remedies prior to appeal. See *BRT General Corp.* v. *Water Pollution Control Authority,* 265 Conn. 114, 116–27, 826 A.2d 1109 (2003); *River Bend Associates, Inc.* v. *Water Pollution Control Authority,* 262 Conn. 84, 86–87, 809 A.2d 492 (2002). Section 13 of P.A. 03-177 expressly addressed the appeals procedure, as well as provided time frames within which water pollution control authorities must act when considering applications or requests. See footnote 2 of this opinion. Section 13 (a) set forth a sixty-five day deadline for certain decisions to be issued by such authorities. Section 13

(b) provided a right of appeal from such decisions, in accordance with § 8-8, under which aggrieved parties may appeal directly to the Superior Court. See footnote 8 of this opinion.

There is nothing in this provision that expressly indicates any substantive change to the law. Nor does it reference any other statutes that impose substantive limitations on land use boards. Moreover, aside from § 13 of P.A. 03-177, which sets forth procedural changes, water pollution control authorities are not mentioned elsewhere in the act. The plaintiff's reliance on statements made before the planning and development committee, asserting a need for uniformity between the defendant's procedures and those of land use boards, reads something into them that their plain meaning does not convey. Simply because the legislature decided to subject both the defendant and land use boards to some of the same procedural requirements for taking an appeal does not suggest an intent to change the substantive law governing such decisions.

In sum, there is nothing to support the plaintiff's construction of P.A. 03-177. As our previous discussion indicates, there was no void that the legislature needed to fill to prescribe parameters for the exercise of the defendant's authority. Moreover, the plaintiff's claim that the right of appeal would be meaningless unless we read the statute to effectuate such a change is without merit. Although, as we have indicated, the defendant is vested with considerable discretion, that discretion cannot be exercised in a manner that is arbitrary, capricious or otherwise contrary to law. In the absence of any indication of legislative intent, we cannot engraft additional requirements onto an otherwise silent provision. *Farmers Texas County Mutual* v. *Hertz Corp.*, 282 Conn. 535, 546–47, 923 A.2d 673 (2007). We therefore conclude that the trial court properly determined that P.A. 03-177 did not change the broad discretion vested

in water pollution control authorities to determine whether, and under what circumstances, they would provide sewer service within their municipalities.

## II

The plaintiff's next claim is that the trial court improperly determined that the defendant's denials of its applications: (1) were not the result of arbitrary, unfair action in abuse of its discretion; and (2) were not discriminatory. Specifically, with respect to its first contention, the plaintiff claims that the plain language of the regulations indicates that the "property would be encouraged, if not required" to connect to the public sewer, and the defendant's reliance upon documents not referenced in the regulations perpetrated an unfair and unreasonable surprise on the plaintiff. With respect to its second contention, the plaintiff contends that the regulations were applied in a discriminatory manner because sewer service is "routinely" granted for properties outside of the designated area for service. We disagree.

### A

We begin our analysis by setting forth the standard of review, as well as the statutory and regulatory scheme that governed the defendant's decision. In considering an application for sewer service, a water pollution control authority performs an administrative function related to the exercise of its powers. See *BRT General Corp.* v. *Water Pollution Control Authority*, supra, 265 Conn. 121 (noting that defendant was performing administrative function when considering application for sewer service); *Wright* v. *Woodridge Lake Sewer District*, supra, 218 Conn. 149 (noting that water pollution control authorities may perform any act pertinent to transportation, collection and disposal of sewage); see also General Statutes § 7-247 (a) (setting forth duties of water pollution control authorities with respect to sewer systems). When a water pollution con-

trol authority performs its administrative functions, "a reviewing court's standard of review of the [authority's] action is limited to whether it was illegal, arbitrary or in abuse of [its] discretion . . . ." (Internal quotation marks omitted.) *Clifford* v. *Planning & Zoning Commission*, 280 Conn. 434, 440, 908 A.2d 1049 (2006). Moreover, there is a strong presumption of regularity in the proceedings of a public agency, and we give such agencies broad discretion in the performance of their administrative duties, provided that no statute or regulation is violated. Id., 441.

With respect to factual findings, "a reviewing court is bound by the substantial evidence rule, according to which, [c]onclusions reached by [the authority] must be upheld by the trial court if they are reasonably supported by the record. The credibility of the witnesses and the determination of issues of fact are matters solely within the province of the [authority]. . . . The question is not whether the trial court would have reached the same conclusion, but whether the record before the [authority] supports the decision reached. . . . If a trial court finds that there is substantial evidence to support a [water pollution control authority's] findings, it cannot substitute its judgment for that of the [authority]. . . . If there is conflicting evidence in support of the [authority's] stated rationale, the reviewing court . . . cannot substitute its judgment as to the weight of the evidence for that of the commission. . . . The [authority's] decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons given."[12] (Internal quota-

---

[12] We note that we previously have not stated expressly the standard that a reviewing court must apply when reviewing a decision of a water pollution control authority. Although we explicitly have found that water pollution control authorities are not subject to the same principles of law applicable to land use agencies; see part I of this opinion; they nevertheless perform an important administrative function. See *BRT General Corp.* v. *Water Pollution Control Authority*, supra, 265 Conn. 121 (noting that defendant was performing administrative function when considering application for sewer

tion marks omitted.) *Vine* v. *Zoning Board of Appeals*, 281 Conn. 553, 559–60, 916 A.2d 5, on remand, 102 Conn. App. 863, 927 A.2d 958 (2007). Accordingly, we review the record to ascertain whether it contains such substantial evidence and whether the decision of the defendant was rendered in an arbitrary or discriminatory fashion.

Prior to the events at issue in this appeal, and pursuant to its authority under § 7-247 (a); see footnote 11 of this opinion; the defendant had adopted regulations governing, inter alia, connections to and extensions of the public sewer system. Under these regulations, a public sewer is defined as "a sewer owned by the [t]own to which all owners of nearby or abutting properties have rights of access, subject to the [defendant's] [r]egulations."[13] Middlebury Water Pollution Control Authority Regs., art. II, § 16. Two regulations, one for owners and the other for property developers, address sewer connections. Owners of property that abuts a street containing a public sewer are required to connect sanitary facilities servicing such property to the public sewer, provided that the sewer is within 100 feet of the property line. Id., art. III, § 4.[14] Similarly, a developer

service). The standard of review that we employ in the present case is consistent with that used for reviewing the decisions of other administrative agencies, including zoning boards of appeal and other land use agencies, all of whom exercise delegated powers, albeit under varying amounts of discretion.

[13] Although the trial court appears to have read this regulation to provide parameters for the defendant's decision to grant or deny applications for a connection, we construe this regulation simply to provide a definition applicable to sewer access as a matter of right both by way of a regulation requiring a connection or by way of the granting of an application for an extension.

[14] Article III, § 4, of the Middlebury water pollution control authority regulations provides in relevant part: "The owner of any unit, situated within the [t]own on property abutting on any street, alley, or right-of-way in which there is now located or may in the future be located a public sewer, is hereby required at his expense to connect all sanitary facilities directly with such public sewer in accordance with the provisions of these regulations, within ninety . . . days after date of mailing of official notice to do so, to

of property or a subdivision "abutting on any street, alley or right-of-way in which there is now located, or may in the future be located, a public sewer, is . . . required . . . to connect all sanitary facilities directly with such public sewer in accordance with the provisions of these regulations." Id., art. III, § 5.

The regulations provide the following parameters for developers whose property does not fall within the ambit of the connection regulation to request an extension of the sewer system: "Where the developer of property or a subdivision is not required to connect under the provisions of [article III, § 5] . . . he may at his option submit a written application to [the defendant] to come within such provisions by constructing a new public sewer line connecting the property or subdivision's main sewer line with the existing public sewer. Such application shall meet all of the provisions of [article III, § 5], and in addition shall show approvals of any necessary easements across private property and shall identify owners of the property abutting the new public sewer. . . . [The defendant] will determine whether or not such abutting property is especially benefited by the new public sewer or whether it is primarily for the convenience of the developer in determining whether or not assessment shall be made and whether an order to connect shall be made under [article III, § 3] . . . ." Id., art. III, § 6.

The defendant, in accordance with § 7-246 (b); see footnote 3 of this opinion; also developed master plans for the sewer system in 1967 and 1991. These plans identified areas of need for current and future municipal sewer facilities development. The 1991 plan explicitly identified areas of concern for sewer development, which include: "developing an on-site septic system

his last known address, provided that said public sewer is within [100] . . . feet of the property line . . . ."

management and sewer avoidance programs; and lim-
iting the extension of the sewer system to those areas
where no other practical alternatives are possible to
correct wastewater disposal or water quality
problems."

## B

With this background in mind, we turn to the plain-
tiff's contention that the defendant's decision was arbi-
trary and an abuse of its discretion. For the reasons
that follow, we disagree.

The record reveals that the defendant denied the
applications for a sewer connection and an extension
for a number of reasons. With respect to the connection
application, the defendant stated: (1) the application
essentially requested an extension, rather than a con-
nection; (2) the requested capacity is "far in excess of
any capacity that would be given to this property"; (3)
the connection regulations and forms were intended
for subdivision developments; and (4) "[e]ven if the
property were located within the distances stated in the
regulation, the intention of the regulations and forms is
not to permit connections and capacity commitments
solely because a property owner is able to obtain a
private easement to existing interceptor sewers to ser-
vice a property in an area that was not planned for
sewers." With respect to the extension application, the
defendant provided nine reasons to support its denial,
including: (1) neither the 1967 master plan nor the 1991
plan identified the Regan Road area, including the plain-
tiff's property, as having a need for sewer service, and
sewer service therefore never was planned for the prop-
erty; (2) the 1991 plan emphasizes a policy of sewer
avoidance, which both the state and town have followed
for many years, and which avoids expanding sewers
into areas not previously designated for sewer service
unless a specific need is identified for service, such as

to correct health issues or if alternative measures are not feasible; (3) the property and surrounding area are best served by individual septic sites, as they are sparsely populated and are surrounded by wetlands, a conservation area and a brook; (4) the sewage capacity requested by the plaintiff is disproportionately large for the size of the property; and (5) the sewage capacity requested seeks a disproportionately large amount of the remaining sewage capacity available to service the rest of the entire town, including areas that have been planned for a sewer connection, but where sewer construction has not been completed.

1

With respect to the application for a connection, it is clear that there was substantial evidence to support the defendant's determination that the application was not for a "connection" under the regulations but, rather, was for an "extension." Under the regulations addressing connections, only developers or owners of property "*abutting* on any street, alley or right-of-way in which there is now located, or may in the future be located, a public sewer" must connect sanitary facilities servicing such property to the public sewer. (Emphasis added.) Middlebury Water Pollution Control Authority Regs., art. III, §§ 4 and 5. It is undisputed that the plaintiff's property does not abut Porter Road, where the sewer to which the plaintiff sought to connect was located.[15]

---

[15] In its brief to this court, the plaintiff appears to claim that its property abuts a street in which a public sewer is contained because it abuts Regan Road, in which a sewer is located some 500 feet from its property. Before the trial court, however, the plaintiff did not advance this theory but instead contended that it is an owner of property that is nearby a sewer, that it had obtained an easement through which a connection could be made and, therefore, that it has a right of access to the sewer pursuant to the regulation's definition of a public sewer. As we previously have noted; see footnote 13 of this opinion; we do not construe the definition of a sewer to provide substantive rights separate and independent of the connection and extension regulations. Moreover, it is well settled that a plaintiff may not advance a

The plaintiff claimed, however, that it could connect to the Porter Road public sewer *via an easement* over land that did abut Porter Road. Although an easement is a legally recognized property interest, it does not constitute ownership. Rather, it is merely "[a] right of use over the property of another." Black's Law Dictionary (6th Ed. 1990); accord *Posick* v. *Mark IV Construction Co.*, 109 Conn. App. 777, 781, 952 A.2d 1271 (2008) ("An easement is not an estate in land, but is merely an interest in land in the possession of another. An easement therefore is distinct from the right to occupy and enjoy the land itself, and common-law courts have consistently distinguished between ownership of an easement and ownership of the burdened land." [Internal quotation marks omitted.]). Consequently, the plaintiff's easement over property that abutted Porter Road was not a sufficient property interest to bring the plaintiff's property within the clear language of the connection regulations.

Indeed, unlike the regulations for connections, the regulation governing applications for extensions expressly provides for access to sewers by way of easement under certain circumstances. See Middlebury Water Pollution Control Authority Regs., art. III, § 6 ("[s]uch application shall meet all of the provisions of [article III, § 5], and in addition shall show approvals of any necessary easements across private property and shall identify owners of the property abutting the new public sewer"). Thus, it is clear that, although easements may provide a basis for the extension of sewer lines, they do not provide a basis for seeking a connection under the regulations. Therefore, the plaintiff's claim that the "plain language" of the regulations indicates that its property would be "encouraged, if not required," to connect to the public sewer is untenable.

---

new theory to this court for the first time on appeal. *State* v. *Jose G.*, 290 Conn. 331, 344, 963 A.2d 42 (2009).

Indeed, the plaintiff acknowledged at the initial hearing before the defendant that it had filed applications for both a connection and an extension only because it was not sure which of the two processes was appropriate for its property. Accordingly, the trial court properly determined that there was substantial evidence supporting the defendant's denial of the connection application.

2

With respect to the application for an extension of the sewer in Regan Road to service the property, although the defendant provided nine reasons for denying the application, in the interest of judicial economy, we limit our focus to three of those reasons. We conclude that the trial court properly determined that there was substantial evidence to support the following reasons given for the denial of the extension application: (1) the property was not located in an area designated for sewer service; (2) the approval of the application would be contrary to the defendant's long-standing policy of sewer avoidance; and (3) the sewage capacity sought by the plaintiff was excessive.

The record reflects the following evidence to support the defendant's conclusion that the property was not located in an area designated for sewer service. At the January 17, 2006 hearing, Angieri stated that neither the 1967 master plan nor the 1991 plan had identified the plaintiff's property as having a need for sewers and, accordingly, no construction plans were prepared to support sewers to service the property. He further stated that the Porter Road interceptor had not been built for or intended to service the property. The defendant's attorney, Kenneth J. Pocius, acknowledged on the record that the defendant's sewer plan did not cover the property. It is clear that the defendant has exclusive statutory authority under § 7-246 (a) to designate areas

for sewer service, and that it has authority to develop water pollution control plans under § 7-246 (b). See footnote 3 of this opinion. The plaintiff points to no statutory or regulatory authority holding that the defendant is required to change or to expand such designations. Nor does it contend that the sewer plans themselves are irrational or that it was entirely unfeasible to utilize septic systems on its property. Accordingly, such testimony and exhibits adequately supported the defendant's conclusion that an extension was not warranted because the property was not located in an area designated for sewer service.

Our review of the record also indicates that there was substantial evidence supporting the defendant's conclusion that an extension would be contrary to its long-standing policy of sewer avoidance. At the January 17, 2006 hearing, Angieri noted that extending the sewer to support the plaintiff's property would be inconsistent with both state and town sewer avoidance policies that had been in effect since 1991. He stated that the property had little developable area, consisting mostly of wetlands and a brook, and noted that "the extension of sewers into that type of land is not the primary way to handle sewage disposal . . . ." Indeed, at the January 19, 2006 hearing, Pocius introduced the 1991 plan, the town's plan of conservation and development, and a map from the state plan of conservation that indicated that the property is located within a conservation area. The 1991 plan, developed in accordance with an order of the department of environmental protection, sets forth the following policy: "The town has adopted a new [p]lan of [d]evelopment which describes certain issues that will be considered to improve the quality of the town. These issues appear to be consistent with the policies of the [s]tate . . . [c]onservation and [d]evelopment [p]lan. Significant issues related to wastewater concerns include: protecting water quality;

protecting potential water supplies; developing an on-site septic system management and sewer avoidance programs; and limiting the extension of the sewer system to those areas where no other practical alternatives are possible to correct wastewater disposal or water quality problems. . . . [The defendant] will provide sewer service *only to those areas where the need is demonstrated and repairs to on-site septic disposal systems are not practical. . . . In unsewered areas, sewer extensions would not be allowed unless: on-site disposal systems were proven not to be feasible . . . .*" (Emphasis added.) This policy is echoed in the town's plan of conservation and development. There is no evidence in the record indicating that no practical alternatives, such as septic systems, were available for sewage disposal at the property. Accordingly, there was substantial evidence in the record to support the defendant's conclusion that the application for an extension should be denied because it would be contrary to the defendant's long-standing policy of sewer avoidance.

With respect to the plaintiff's claim that the defendant improperly relied on documents external to its regulations in rejecting the plaintiff's application for the aforementioned two reasons, we disagree. For the reasons set forth in part I of this opinion, the plaintiff's reliance on zoning case law for the proposition that the defendant is subject to the same constraints as are zoning boards in the application and specificity of its regulations is misplaced. As we already have underscored, the defendant has broad discretion, pursuant to statute, to determine whether to provide sewer service to various areas within the municipality. General Statutes § 7-246 (b); *AvalonBay Communities, Inc.* v. *Sewer Commission,* supra, 270 Conn. 423. Section 7-246 (b) specifically authorizes the defendant to develop water pollution control plans that designate certain areas as ones in which service is to be avoided. Moreover,

because the defendant is required to file such plans with the commissioner of environmental protection; see General Statutes § 7-246 (b); state and local environmental policies that disfavor additional sewer capacity in certain areas clearly would be relevant to any decision concerning whether to provision sewer service to that area. We therefore conclude that the plaintiff's claim of unfair surprise that these plans would be relevant to the defendant's determination is baseless.

Finally, it is clear that there was substantial evidence to support the defendant's determination that the extension application should not be granted because the sewage capacity sought by the plaintiff exceeded the defendant's safe design standards for evaluating extension applications, and that such capacity was a disproportionately large allocation of the town's remaining sewer capacity for the size of the parcel. The record reveals that the application had requested a capacity of 50,505 gallons per day of sewage capacity to support 650 bedrooms. See footnote 4 of this opinion. At the January 17, 2006 hearing, Angieri, who had reviewed the calculations supporting the capacity requested by the plaintiff, testified that by applying the town's "safe design standards" utilized in developing the 1967 master plan—which the defendant applies to all applications in order to normalize them—the capacity actually required to support the plaintiff's development project would be 127,000 gallons per day. He stated that the average available unused sewage capacity for the town was approximately one million gallons per day. Angieri then concluded that the approval of the 127,000 gallons per day of requested capacity would allocate approximately 10 percent of the remaining capacity available for the entire town to a property that represented less than 1 percent of the available land area in town. Angieri further noted that the sewer system had been designed for a rural community to service roughly six people

per acre of developable land. In contrast, the plaintiff's proposed development would require the town to allocate sufficient sewer capacity to service roughly sixty-seven people per acre of developable land, far in excess of the specifications under which the system had been designed. On the basis of this information, Angieri concluded that "[t]he request is . . . inconsistent with the overall system design, management and safe capacity allocations" and recommended that the applications be denied.

Although the plaintiff later amended its capacity calculation to 81,250 gallons per day, that amended figure still, by our calculations, would have represented roughly 8 percent of the town's remaining sewage capacity for 1 percent of the land area.[16] Therefore, even if the defendant had credited this testimony, which it was not required to do; *Goldstar Medical Services, Inc.* v. *Dept. of Social Services*, 288 Conn. 790, 833, 955 A.2d 15 (2008); substantial evidence still would exist to support the defendant's conclusion that the extension application should be denied because the plaintiff's requested sewage capacity was disproportionately large in relation to the property's size and exceeded the safe design standards for the public sewer.

C

Finally, we address the plaintiff's claim that the defendant applied its regulations in a discriminatory manner because it "routinely" has approved other properties outside the designated sewer area for sewer service without a particularized showing that service is necessary to avoid health and safety problems. The plaintiff

---

[16] As we previously noted, Angieri had stated that the average available unused sewage capacity for the town was approximately one million gallons per day. Therefore, the plaintiff's amended capacity figure of 81,250 gallons per day represents 8.1 percent, or approximately 8 percent, of the remaining sewage capacity for the town.

points to three development projects that are located outside the designated sewer area that were granted sewer service, namely, the Avalon Farms, Ginsberg and Benson Woods development projects. The plaintiff further claims that the defendant improperly inflated the calculations used to determine the usage that the plaintiff's project would require, as compared to the calculations the defendant used to determine the usage of the three development projects.

In response, the defendant asserts that the applications highlighted by the plaintiff each provided some further benefit to the town, whereas the plaintiff's application failed to provide any such additional benefit. It contends that it properly may consider such benefits to the town in acting on applications for sewer connections or extensions. We agree with the defendant.

The record reveals the following evidence in support of the defendant's conclusion. At the hearing on the applications, Angieri had explained that the approval of the Avalon Farms application would give the town the ability to provide sewer service to the police and fire stations and that the application also had included the installation of a pump station to service an additional thirty properties nearby. He also had stated that the Ginsberg project had provided a benefit to the town by installing a pump station and an additional 5000 feet of sewer " 'to serve the public interest through their property, not including anything that would serve their property.' " With respect to the Benson Woods development project, that application sought a connection, rather than an extension, which falls under a different regulation. The Avalon Farms, Ginsberg and Benson Woods applications, therefore, are inapposite to the application in the present case.

Additionally, the trial court noted that, for each of the applications cited by the plaintiff, the estimated

capacity per acre was significantly lower than the capacity sought by the plaintiff. Specifically, the trial court noted that, using the minimum estimate for the plaintiff's property, the capacity estimated was approximately 2525 gallons per day per acre served. In contrast, the Avalon Farms, Benson Woods and Ginsberg development projects each requested 640, 404 and 330 gallons per day per acre served, respectively.[17] The plaintiff's application, therefore, sought nearly four times the sewage capacity per acre than the greatest of the applications it cites. In light of the differences between the other applications and those of the plaintiff, it is clear that the defendant's failure to approve the plaintiff's applications was not discriminatory.

The judgment is affirmed.

In this opinion the other justices concurred.

___

[17] The trial court also pointed to the fact that the Benson Woods project was an age restricted community, which carries a low probability that two people would occupy each bedroom. It therefore concluded, and we agree, that the defendant reasonably could have used lower figures for calculating the capacity for that project than the figures that it used for calculating the plaintiff's and other development properties.